**Dave FLEISCHER, individually and as trustee in dissolution of Fleischer Studios, Incorporated, a Florida corporation, Plaintiff,**

**v.**

**A.A.P., Inc., et al., Defendants.**

United States District Court
S. D. New York.
April 25, 1958.

Gustave B. Garfield, New York City, for plaintiff.

Phillips, Nizer, Benjamin & Krim, New York City, for defendants Paramount Pictures, Inc., Paramount Pictures Corp. and Flamingo Films, Inc. Louis Phillips, Seymour Shainswit, New York City, of counsel.

Stillman & Stillman, New York City, for defendants A.A.P. Inc. and W.P.I.X. Inc.

Robert A. Dreyer, New York City, for defendant Dumont Broadcasting Corp.

HERLANDS, District Judge.

I.

The decisive question raised by plaintiff's motion for an injunction against defendants' attorneys is: Are the issues and subject-matter of the present lawsuit "substantially related" to the issues and subjects of other and prior litigation and legal matters in which the attorneys now representing three of the defendants herein formerly represented the plaintiff and the plaintiff's interests and associates during the years 1929 to 1940?

The plaintiff, Dave Fleischer, suing individually and as trustee in dissolution of Fleischer Studios Incorporated (a Florida corporation, referred to herein as "the Florida corporation") seeks to restrain the law firm of Phillips, Nizer, Benjamin & Krim from appearing in this action as attorneys for three of the defendants: Paramount Pictures, Inc., Paramount Pictures Corporation and Flamingo Films, Inc. There are eight additional co-defendants, for whom the Phillips law firm does not appear.

The ground of the motion is that said attorneys' appearance and representation violate Canons 6 and 37 of the Canons of Professional Ethics, Judiciary Law, Appendix, McKinney's Consol.Laws N.Y. c. 30 [Rules of the United States District Court for the Southern District of New York, General Rule 5(c)].[1] The gist of the plaintiff's claim is that the law firm of Phillips & Nizer and Louis Phillips, a partner in that firm (which firm is the predecessor of the present law firm of Phillips, Nizer, Benjamin & Krim) rep-

1. Canon 6. Adverse Influences and Conflicting Interests

" * * * The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from · others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

Canon 37. Confidences of a Client

"It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client."

General Rules of the United States District Court for the Southern District of New York, Rule 5(c):

"(c) Professional misconduct shall include * * * a failure to abide by the provisions of the canons of ethics of the American Bar Association or of the New York State Bar Association."

resented him and his brother, Max Fleischer, and the two corporations of which they were equal shareholders (Fleischer Studios Inc., a New York corporation, referred to herein as "the New York corporation," and the previously mentioned Florida corporation, the successor to the New York corporation) from 1929 to 1940 as their lawyers in legal matters "substantially related" to the issues in the litigation at bar.

This claim of "substantial relationship" is denied by defendants' attorneys.

The parties draw sharply different inferences from the transactions and contracts mentioned in the voluminous motion papers.

A recital of the ascertainable facts should be preceded by an explicit statement of the controlling principles of law and policy in the light of which the facts must be examined and appraised.

## II.

The dual duty imposed upon members of the bar by Canons 6 and 37 includes the obligation: (1) not to disclose confidential information obtained from the client by the attorneys; and (2) to represent the client with undivided fidelity by not representing conflicting interests.

In enforcing this dual duty, the courts have been confronted with the questions (a) whether confidences have been reposed in the attorney; and (b) whether the attorney represents an interest that in fact and in law conflicts with the interest he formerly represented.

Without requiring the client to reveal what he had disclosed to his former attorney (see Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corp., 2 Cir., 1954, 216 F.2d 920, 926, 52 A.L.R.2d 1231), the courts have sought the answers to the foregoing questions by examining the nature of the work performed for the former client and scrutinizing the nature of the duties presently owing to the new client. If, upon such examination and scrutiny, it appears that there are inconsistencies in position or the real possibility that confidential communications may be divulged or utilized, the attorney will be disqualified.

Where an attorney represents a litigant in a case involving the very matters concerning which he originally represented the party now on the other side, the attorney will be disqualified. Fisher Studio, Inc., v. Loew's Incorporated, 2 Cir., 1956, 232 F.2d 199; Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corp., 2 Cir., 1954, 216 F.2d 920, 52 A.L.R.2d 1231; Empire Linotype School, Inc., v. United States, D.C.S.D.N.Y.1956, 143 F.Supp. 627; Packer v. Rapoport, Sup.1949, 88 N.Y.S. 2d 118.

Although all of the information obtained by the attorney from his former client may be available to his present client through other sources or channels, the attorney will, nevertheless, be disqualified. Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L.J. 917, 919 (1955). In the latter situation, the courts are more concerned with the avoidance of the appearance of evil than with an actual unfair or unethical use of confidential information. See United States v. Standard Oil Company, D.C. S.D.N.Y.1955, 136 F.Supp. 345; Note, 64 Yale L.J., supra.

A statement of what facts a former client must submit to the court in order to have his former attorney disqualified in a particular case was formulated as follows by Judge Weinfeld in T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y.1953, 113 F. Supp. 265, 268, 269:

"* * * the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney

previously represented him, the former client. * * * In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of Canon 6."

The above formulation was specifically approved by the Court of Appeals in Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corp., supra, 216 F.2d at pages 924–925, where the Court also pointed out that the statement "was not a rule of substantive law purporting to define the professional obligation. It went no further than to measure the quantum of evidence required for proof of the obligation." This rule has ben consistently applied by the courts. Fisher Studio, Inc., v. Loew's Incorporated, supra; United States v. Standard Oil Company, supra.

The courts have generally treated this so-called rule of evidence as creating an "irrebuttable inference" that confidential information, material and relevant to the instant case, was given to the attorney if the issues and subject-matter of the former case are substantially related to issues and subject-matter of the present litigation. See Laskey Bros. of West Virginia, Inc., v. Warner Bros. Pictures, Inc., 2 Cir., 1955, 224 F.2d 824, 827, certiorari denied 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814. In a case where the attorney may be "vicariously disqualified" (as by virtue of his former membership in a law partnership), the inference is treated as rebuttable. Harmar Drive-In Theatre, Inc., v. Warner Bros. Pictures, Inc., 2 Cir., 1956, 239 F.2d 555, rehearing denied 2 Cir., 1957, 241 F.2d 937.

█ Underlying the above general rule are strong reasons of policy: (1) to encourage and protect inviolate confiden-

tial communications between client and attorney; and (2) to inspire and maintain public respect for and trust in the law and lawyers. See United States v. Standard Oil Company, supra, 136 F. Supp. at 355.

In particular situations, e. g., where pre-trial discovery is sought, the courts may be confronted by policy considerations pulling in another direction. See Laskey Bros. of West Virginia, Inc., v. Warner Bros. Pictures, Inc., 2 Cir., 1955, 224 F.2d 824.

"The policy of maintaining public confidence in the inviolate nature of confidential communications to attorneys and in the fidelity of attorneys to their clients' interests highlights only one aspect of the problem. Modern discovery procedures are based on the desirability of making available to litigants all the facts necessary for a full presentation of their case. * * * A formulation of the attorney's ethical obligation which allows a former client to disqualify an attorney who has never received any confidential information useful in the present suit may unnecessarily restrict other parties from access to legal talent most familiar with the facts of their case." 64 Yale L.J., supra, at 927–928.

In accommodating the tug between inconsistent policies, the courts have given greater weight to the socially desirable objective of promoting and preserving the integrity of, and respect for, the bar.

In every case cited in this opinion, in the briefs of both parties herein, and in the bar association opinions on legal ethics—except United States v. Standard Oil Company, supra, it was clear that there was virtual identity between the issues in the former and the current litigation, or it was equally clear that there was a lack of "substantial relationship" between such issues. Consequently, decisional law construing and implementing the concept of "substantial relationship"

is relatively undeveloped. In United States v. Standard Oil Company, supra, the only prior case posing a closely analogous problem, Judge Irving R. Kaufman analyzed the documentary and other evidence presented to him and concluded that a Government attorney, who had worked for ECA, Paris branch, was not disqualified from representing the defendant in a suit brought by the United States to collect for overcharges in ECA financial transactions, where it clearly appeared that all of the data, information and policy on the transactions had emanated from the Washington office and had never been accessible to or passed upon by the attorney in the Paris office.

United States v. Standard Oil Company, supra, however, does not control the decision in the present case. In the Standard Oil case, the controverted question of fact was whether the former Government attorney had, in the course of his official work, come in contact, directly or indirectly, with the subject-matter of the then current suit, i. e., what had been the scope and character of the former duties and activities of the attorney. Furthermore, Canon 36 influenced the Court in the Standard Oil case, but plays no role in this case. See Note, 57 Colum.L.Rev. 994, 998–999 (1957).

■■ The fact that the conflict may appear to be rather remote, while relevant, is not determinative. Drinker, Legal Ethics 108 (1953). The pragmatic test is whether the prior matters or evidence concerning them may be admitted into evidence with respect to the current litigation. Watson v. Watson, Sup.1939, 171 Misc. 175, 11 N.Y.S.2d 537. Moreover, the duty of an attorney to avoid conflicting interests is not adequately definable in the precise terms of the attorney-client privilege and the incompetency of privileged communications. Packer v. Rapoport, Sup.1949, 88 N.Y.S. 2d 118. The governing principle is that the Court must protect a client against even the unintentional or unconscious use by his *former* attorney of his confidential communications. Watson v. Watson, supra.

■ On the other hand, the mere fact without more that a former attorney is incidentally connected with the now adverse interest does not disqualify the attorney. United States v. Standard Oil Company, supra; Adams v. Adams, 1953, 156 Neb. 778, 58 N.W.2d 172; Drinker, Legal Ethics 107 (1953).

■ Only where it is clearly discernible that the issues involved in a current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up to the standard of legal ethics.

■ The stated rule does not shift a burden of disproof upon the attorney sought to be disqualified by his former client. On the contrary, the former client must show that there is a "substantial relationship" between the issues in the present case and the subject-matter of the former representation. Nevertheless, should the question be close, it should be resolved in favor of the client. As Judge Irving R. Kaufman said in United States v. Standard Oil Company, supra, 136 F.Supp. at page 364:

> "I agree, that where there is a close question as to whether particular confidences of the former client will be pertinent to the instant case, an attorney should be disqualified to avoid the appearance if not the actuality of evil."

### III.

We now turn to a general consideration of the question whether the issues in the present case are "substantially related" to any of the prior legal matters and litigation during the years 1929 to 1940, in which the Fleischer corporations or Max or Dave Fleischer was represented by Louis Phillips or any present member of his law firm. To answer that question, it is necessary to consider a number of

contracts and lawsuits and the background of such matters.

During the period from 1929 to 1942, Dave and Max Fleischer and the Fleischer corporations produced hundreds of animated motion picture cartoons. The best known of such creations included "Popeye," "Betty Boop," "Superman," "Screensongs" and several full-length animated motion picture cartoons. All of these cartoons were distributed by Paramount Pictures Corporation.

Louis Phillips is presently senior partner in the law firm of Phillips, Nizer, Benjamin & Krim. He also is vice-president and general counsel of Paramount Pictures Corporation.

From 1928 to 1946, Mr. Phillips was an attorney in Paramount's legal department. From 1946 to April 1955, he was assistant general counsel; and, from April 1955 to date, general counsel of that corporation.

During the earlier years of their relationship, Mr. Phillips and the Fleischer brothers were on very friendly terms.

In April 1932, one Helen Kane brought an action for damages in the Supreme Court of the State of New York, New York County, against Max Fleischer, the New York corporation, and Paramount Publix Corp. (predecessor of the present Paramount corporations). The suit was based upon the use of a cartoon character named "Betty Boop," created by Max Fleischer and distributed by Paramount. Plaintiff-Kane had originated, used and popularized the expression "Boop boop a doop." The Fleischer defendants appeared by their own attorney, the late N. William Welling. Paramount employed both Mr. Phillips and Mr. Nizer to work on the case, in one capacity or another. There is no discernible relevance of this 1932 litigation to the present case. Moreover, plaintiff admits that the Fleischers were not represented in that litigation by the Phillips & Nizer firm or by either Mr. Phillips or Mr.

Nizer. (Plaintiff's rebuttal affidavit, sworn to November 25, 1957, p. 2 c.)

On July 7, 1932, Phillips & Nizer commenced an action in this Court, in behalf of Fleischer Studios, Inc. and one Joseph Kallus against Art Doll Co. for copyright infringement of the "Betty Boop" doll (Fleischer Studios, Inc., v. Ralph A. Freundlich, Inc., D.C.S.D.N.Y., 14 F. Supp. 401). Plaintiff now argues that, during the course of the Art Doll litigation, the attorneys were informed of their clients' patent and copyrights in "Betty Boop," the history of the firm, the origin of the work, their work methods, and the work performed by each of the Fleischer brothers (plaintiff's rebuttal affidavit, sworn to November 25, 1957, p. 2 b). Upon close analysis, the Court does not perceive any relevance of the Art Doll case to any current issue.

During 1932, there were negotiations between the New York corporation and King Features Syndicate, Inc., with respect to the right to use in motion picture cartoons a comic strip character called "Popeye," which character was owned by King Features. King Features desired to have "Popeye" cartoons released through the same channels as the "Betty Boop" cartoons. King Features, therefore, wanted certain representations and warranties from Paramount. As a result, Phillips & Nizer represented the New York corporation in the 1932 negotiations vis-a-vis King Features. A five-year license agreement was executed on or about November 17, 1932. A copy of a draft of that agreement (used during the negotiations in September 1932) is appended to plaintiff's affidavit of November 4, 1957. Pursuant to this agreement, approximately one hundred "Popeye" cartoons were produced.

In 1938, Joseph Kallus commenced suit in the New York state courts against Fleischer Studios Inc., the New York corporation, to collect for his services in negotiating the 1932 King Features license agreement. Phillips & Nizer were attorneys for the defendant in that case.

The case involved the circumstances surrounding the negotiations of the 1932 King Features license.

In 1937, another license agreement between King Features and the New York corporation was executed. (The 1932 agreement was due to expire on July 31, 1938.) Any "Popeye" cartoons produced after July 31, 1938 were to be governed by the 1937 agreement (Exh. CC attached to the Phillips' rebuttal affidavit, sworn to December 12, 1957). In the negotiations for the 1937 agreement, the Fleischer interests were represented by the Fleischers' personal attorney, the late N. William Welling, while the Paramount interests were represented by Bernard Goodwin of Paramount's legal department (Phillips' rebuttal affidavit, pp. 19–20; Goodwin's affidavit, p. 4).

During 1937 to 1938, the New York corporation ran into certain labor problems. It also had under consideration the making of a full length motion picture. Plaintiff now argues that he consulted Mr. Phillips about these labor problems and the full length motion picture. "The solution of this problem [the full length cartoon movie] as well as our labor problems was supplied by an attorney, Louis Philips [sic], who counseled and advised the removal of our plant and transfer of the seat of our operations to Florida" (D. Fleischer affidavit of November 25, 1957, p. 2 d). On the other hand, Mr. Phillips denies that he had counseled the Fleischers to move to Florida. Mr. Phillips claims that "the decision to move to Florida was strictly the Fleischers decision" (Phillips' rebuttal affidavit of December 12, 1957, p. 5).

A contract dated May 27, 1938 between the New York corporation and Paramount occupies a central position in plaintiff's second cause of action in the amended complaint. May 27, 1938 is the alleged starting date of the anti-trust conspiracy pleaded in this second cause of action.

The May 27, 1938 agreement has not been presented to the Court. However, according to the amended complaint (paragraphs 7, 9) that agreement provided:

" * * * *inter alia* for the making of a full length motion picture cartoon then in the course of manufacture and subsequently known as 'Gulliver's Travels'; the continuation of the manufacture of the one-reel series known as 'Popeye' series; the making of one two-reel cartoon, and the financing of the removal of the plant and equipment of 'Original Fleischer corporation' [the New York corporation] from New York to Miami Florida; the hypothecation of the assets referred to in paragraph 3, hereinabove set forth [certain cartoons already produced by the New York corporation] as collateral security for loan of $100,-000 to be made by Paramount Pictures, Inc., to finance said removal of plant from New York to Miami; the payment of 50% of all moneys received from the commercial exploitation of the fictional characters *invented or created or used by* 'Original Fleischer corporation' [New York corporation] in any of said motion picture cartoons; a series of options to call upon 'Original Fleischer corporation' [New York corporation] to produce additional cartoons * * *." (Amended complaint, p. 5. See also D. Fleischer affidavit of November 25, 1957, pp. 2 gA to 2 g.)

Plaintiff charges Mr. Phillips with having represented both sides in that contract and that Phillips & Nizer were part of the anti-trust conspiracy (Amended complaint, paragraphs 27, 34, 12, 23[a], 23[b], 23[c], 23[d]). Plaintiff also charges that on April 18, 1939, while Phillips & Nizer were allegedly still *acting as attorneys for the Fleischers,* the Fleischers signed a "supplemental agreement of interpretation" (D. Flei-

scher affidavit of November 25, 1957, p. 2 g). These charges are vigorously denied by Mr. Phillips in his affidavits and in other affidavits submitted by Mr. Phillips in corroboration of his position.

On May 24, 1941, Fleischer Studios, the Florida corporation (represented by N. William Welling) and Paramount (represented by Bernard Goodwin of their legal department) entered into the final agreement. This sixty-two-page document is attached to the original complaint and is referred to in the amended complaint. In view of the fact that it clearly cancels all prior agreements with the Florida corporation and its predecessors, all rights of plaintiff and the Fleischer interests must be traced to and through this May 24, 1941 agreement. (Details of the agreement will be discussed whenever they become pertinent to the problem now before the Court.)

In separate letter agreements likewise dated May 24, 1941, Max and Dave Fleischer personally assumed the Florida corporation's duties and obligations under the May 24, 1941 contract.

It is now necessary to consider the allegations contained in the three claims or causes of action set forth in the amended complaint.

The first claim recites the background facts, to which this opinion has already alluded. It then alleges that certain cartoons (called "New Cartoons") were produced pursuant to the May 24, 1941 contract; that defendants violated plaintiff's contractual rights in relation to said "New Cartoons" and plaintiff's rights in the old cartoons as preserved by the May 24, 1941 contract. In his affidavit (p. 12), plaintiff's attorney sums up this first claim in the following words: "a cause of action for unfair competition, an accounting and conspiracy among all of the defendants to destroy the plaintiff's rights under the agreement of May 24, 1941, particularly his rights in 'Popeye' cartoons."

The second claim charges a violation of the anti-trust laws. Plaintiff alleges that certain clauses in the 1938 and 1941 contracts violate the anti-trust laws; that, pursuant to an alleged conspiracy, Paramount Pictures resorted to "block booking of films, master agreements as to franchises, aquisition [sic] and use of theatres owned by affiliated companies or theatres owned by distributors either alone or jointly with said defendant being used for distribution of films, discrimation [sic] against and favoring of exhibitors, suppression of films before their full release possibility had been achieved, booking of films of Fleischer Studios, Florida together with its own films of inferior type and quality and the charging of a slight amount for the films of Fleischer Studios, Florida while taking the maximum possible amount for its own films; the rendition of false accounts to Fleischer Studios, Florida made so because of the monopolistic and anti trust activities of defendant Paramount Pictures, Inc." (Amended complaint, paragraph 31). This cause of action is only against Paramount.

The third claim is summarized in the affidavit (p. 12) of plaintiff's attorney as follows: "a cause of action against defendant W.P.I.X. Inc: under the N.Y. Civil rights [sic] Law [McKinney's Consol.Laws, c. 6], Secs. 51 and 50 for invasion of the plaintiff's right of privacy in the use of the 'New Cartoons' of the POPEYE series with plaintiffs name as director thereof, for commercial purposes without his consent."

We return to the question whether the matters in connection with which Mr. Phillips formerly represented the Fleischer interests are "substantially related" to the issues in the litigation at bar.

The position of Mr. Phillips may be briefly summarized as follows:

(a) Regardless of any attorney-client relationship between plaintiff and Mr. Phillips, any and all contracts that were

the product of that relationship are irrelevant to the present case.

(b) The May 24, 1941 contract—in the negotiations of which Mr. Phillips did *not* represent any Fleischer interest —completely terminated "all understandings and agreements of whatsoever nature between Paramount * * * and the Producer"; and, consequently, in view of the latter clause, the May 27, 1938 contract can have no possible bearing upon the present case.

(c) The representation by Mr. Phillips of the Fleischer interests with respect to the November 17, 1932 license agreement between the New York corporation and King Features Syndicate, Inc. is irrelevant because whatever rights the Fleischers may now have stem from the subsequent 1937 license agreement with King Features Syndicate, Inc., the negotiations for which were handled by the late N. William Welling, in behalf of the Fleischers, and *not* by Mr. Phillips.

Moreover, by force of the May 24, 1941 contract and a separate bill of sale, all rights to all cartoons produced to that date—including "all characters contained therein or created or used therefor"— were transferred to Paramount; that is, any rights that the Fleischer interests acquired by the November 17, 1932 license agreement with King Features Syndicate, Inc. were assigned to Paramount. As a consequence, the only rights preserved by the May 24, 1941 contract —and the only Fleischer rights possibly relevant to the present suit—are those created by the 1937 license agreement with King Features Syndicate, Inc. As noted, Mr. Phillips did not represent Mr. Fleischer in negotiating that 1937 agreement.

Plaintiff's position is more difficult to delineate. A synopsis of that position, so far as discernible, contains the following elements:

(a) The decisive question in the present case concerns the property rights in the character "Popeye." The May 24, 1941 agreement reserved to plaintiff, as one of the signatories to said agreement, the personal right to be made a party to any purported assignment of any of the rights in and to the characters in the "New Cartoons" for commercial exploitation by television or otherwise. Paramount breached the May 24, 1941 contract, not only with respect to the "New Cartoons," but also with respect to plaintiff's right to fifty percent of the amount received from the exploitation of the *characters* appearing in the "New Cartoons." Plaintiff's rights to some of these characters date back to the November 17, 1932 license contract with King Features Syndicate, Inc. Therefore, the November 17, 1932 agreement is relevant to define the scope of plaintiff's rights. It may be parenthesized that this novel interpretation of the May 24, 1941 contract is the basis of plaintiff's first claim. (See paragraphs 14 and 21 of the amended complaint and paragraph 19 of the original complaint.)

(b) The 1938 Kallus litigation related not only to the November 17, 1932 license agreement with King Features Syndicate, Inc., but also to the 1937 King Features license agreement.

(c) The plaintiff's second claim relating to anti-trust violations is based on an alleged conspiracy initiated by the May 27, 1938 agreement, whose distribution clauses are violative of the antitrust laws. Plaintiff relies on the decision in United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, to support this contention. Plaintiff charges that this conspiracy was continued by the May 24, 1941 contract; that the conspiracy included efforts to get control of the Fleischer film library in order to exploit it on television; that the November 17, 1932 license agreement with King Features Syndicate, Inc., the May

27, 1938 contract with Paramount, the litigation revolving around the November 17, 1932 contract, and the reasons for moving to Florida will be material elements in the anti-trust case; and that the Phillips, Nizer firm cannot now represent any of the defendants herein because Mr. Phillips allegedly represented the Fleischers in the above-cited matters.

(d) Plaintiff's final argument is based upon the significance of the items called for in defendants' notice of deposition dated October 28, 1957 in the present case. Certain books, papers and records are requested. Plaintiff points specifically to items 2(a), 4(a) and 4(b), reading as follows:

"2. All books, records, contracts, correspondence, documents, legal papers, memoranda, statements, accountings, financial data and all other similar or different books, papers and writings, including *inter alia* the books, records or papers of Fleischer Studios, Inc. (the New York corporation allegedly dissolved on August 8, 1939), which embody, report or reflect, or pertain or relate to

"(a) the respective interests of Dave and Max Fleischer in the stock, assets and business of the New York corporation, Fleischer Studios, Inc., including *inter alia* the nature of the participation of Dave and Max Fleischer in the production of literary works by said Fleischer Studios, Inc.;

\* \* \* \* \* \*

"4. All books, records, contracts, correspondence, documents, legal papers, memoranda, statements, check books, cancelled checks, check vouchers, accountings, financial data and all other similar or different books, papers and writings, including *inter alia* the books, records or papers of the Florida corporation, i. e. Fleischer Studios, Incorporated, and of the New York corporation, i. e., Fleischer Studios, Inc., which embody, report or reflect, or pertain or relate to

"(a) requests or negotiations for, and the making and the terms, provisions and conditions of agreements with the copyright proprietors, respectively, of the 'Popeye' and 'Superman' characters licensing or otherwise granting to said Fleischer Studios, Incorporated, Fleischer Studios, Inc., Max and Dave Fleischer, or any of them, the right to utilize said characters in the production of motion picture cartoons;

"(b) the sums or other consideration paid by Fleischer Studios, Incorporated, Fleischer Studios, Inc., Dave and Max Fleischer, or any of them, for said licenses or permission to utilize the 'Popeye' and 'Superman' characters."

According to plaintiff, the above-quoted items relate to much of the material that allegedly was confidentially disclosed to Mr. Phillips in the course of his representation of the Fleischer interests.

Mr. Phillips' affidavits attempt to minimize the significance of the request for these documents, so far as concerns the present cross-motion by plaintiff. As to Item 2(a), Mr. Phillips' reply affidavit of November 15, 1957 claims the information is requested for two reasons: to show that Dave Fleischer had no interest in the dissolved Florida corporation and that Dave Fleischer could assert no "moral right" to complain of the disposition of these literary works.

In his rebuttal affidavit of December 12, 1957 (p. 21), Mr. Phillips states, with reference to Item 4(b): "Paramount's requested production of the Fleischer corporation's duplicating original or copy of its \* \* \* February 17, 1937 agreement with King Features \* \* \* was merely designed to es-

tablish the simple fact of the limitation on distribution spelled out in the license agreement with King Features, and nothing more."

 In addition to what has already been pointed out, the opposing affidavits raise the point of plaintiff's waiver of his possible objection to Mr. Phillips' and his firm's appearance in the current lawsuit. In support of that argument, said affidavits point to numerous meetings with plaintiff's New York and California attorneys and the knowledge of plaintiff's New York counsel, many months ago, that Mr. Phillips and his firm would represent Paramount. It is argued that plaintiff's and his counsel's failure to protest and their tacit acquiescence constitute a waiver of the present objection. There is grave doubt whether even an express waiver by the former client could, as a matter of law, preclude this motion. See Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corp., 2 Cir., 1954, 216 F.2d 920, 52 A.L R.2d 1231; Packer v. Rapoport, Sup.1949, 88 N.Y.S.2d 118. A motion to disqualify may be made at almost any time before the trial and, perhaps, even during or after the trial. Empire Linotype School, Inc., v. United States, D.C.S.D.N.Y.1956, 143 F.Supp. 627; United States v. Standard Oil Company, D.C.S.D.N.Y.1955, 136 F.Supp. 345. The motion herein has, therefore, been timely made.

 However, the prior conduct and statements of the plaintiff and the plaintiff's attorneys may be considered on the questions of plaintiff's good faith and credibility in connection with plaintiff's present cross-motion to disqualify.

## IV.

 The May 24, 1941 agreement transferred to Paramount the Fleischers' property interest in all of the movie cartoons that they had owned or made prior to the date of the contract. As to "new cartoons," the Fleischers had a fifty percent net profit participation as defined in the contract. This profit-sharing provision referred to the "new cartoons" and the word "characters," so as to encompass the use in such new cartoons of both old characters (i. e., those characters that had been used prior to May 24, 1941) and newly created characters. The distinction is between "cartoons" and "characters," the cartoon being an animated portrayal of one or more characters. The May 24, 1941 contract further provided that, where a character is used in a new cartoon and is also exploited by use other than by movies (such as use on television, in advertising, dolls, etc.) the Fleischers would have a share of the profits resulting from such exploitation.

Under the *1937* license agreement between the Fleischers and King Features Syndicate, Inc., the Fleischers, by express prohibition and exclusion. did not have the right to use on television, the movie cartoons that they had made or would make under and pursuant to the *1937* license agreement. However, plaintiff now contends that (regardless of the 1937 agreement just mentioned) the Fleischers had the right—based on the 1932 license agreement—to use on television both the characters and the movie cartoons that they had used and produced during the years 1932 through 1937, when they were operating under the *1932* license agreement. The 1932 license agreement did not refer to the subject of television; hence, plaintiff now argues that there was no restriction under the *1932* license agreement on the Fleischers' use of characters or cartoons on television.

The next branch of plaintiff's argument concerns the scope or coverage of the word "exploitation," as used in the 1941 contract. Plaintiff argues that, when Paramount used on television the old movie cartoons (i. e., those produced by the Fleischers during the period from 1932 through 1937) *and* such old movie cartoons contained a "character"

that was also used in one of the new cartoons made after May 24, 1941, the use of such old movie cartoons after May 24, 1941 constituted "exploitation" of a character within the meaning of the 1941 contract. Plaintiff then concludes that the Fleischers are entitled to profit-share in the use of such old movie cartoons.

The fallacy of plaintiff's argument is that it blandly overlooks the explicit assignment by the Fleischers to Paramount in the 1941 agreement of *all* of their interest in and to the old movie cartoons. Having expressly divested themselves of *all* interest in the *old* movie cartoons, the Fleischers cannot now use the "exploitation" provision as a device to retain a profit interest in that which they completely surrendered to Paramount.

Mr. Phillips had nothing to do, as Fleischers' attorney, with either the 1937 license agreement with King Features Syndicate, Inc. or the 1941 contract with Paramount. Therefore, in order to tie in Mr. Phillips for purposes of the pending cross-motion, plaintiff resorts to the 1932 license agreement between the Fleischers and King Features Syndicate, Inc., in connection with which Mr. Phillips did represent the Fleischers. Following up the latter point, plaintiff then attempts to show that the 1932 license agreement is substantially related to the issues of the present case. The threads of plaintiff's argument, so far as they may be woven into a coherent thesis, are: the 1932 license agreement contained no restriction, express or implied, as to the Fleischers' use on television of characters or cartoons, and that —contrary to Mr. Phillips' present contention—the 1932 license agreement should be interpreted as permitting the Fleischers to use on television the characters and cartoons made during the years 1932 through 1937. The subsequent 1937 license agreement, as noted, while prohibiting the Fleischers' televi-

sion use of cartoons made under the 1937 license agreement, did not forbid the Fleischers' television use of characters and cartoons made prior to the 1937 license agreement. Since Mr. Phillips represented the Fleischers in the 1932 license agreement, and since Mr. Phillips now takes a position contrary to that of his erst-while clients vis-a-vis the 1932 agreement—an agreement that he negotiated professionally for the Fleischers—plaintiff concludes that Mr. Phillips should be disqualified.

The fallacy of this argument is that the Fleischers no longer have a property interest in the old cartoons produced between 1932 and 1937, because they expressly transferred whatever rights they had in such old cartoons to Paramount by the 1941 contract. If *arguendo* plaintiff has any television rights in the new cartoons or characters, such rights could not be based on the 1932 agreement, in view of the 1941 transfer. Consequently, the open issue for litigation involves the interpretation of the 1941 contract. As will be pointed out in detail below in this opinion, plaintiff himself expressly stated that the vital issue herein is the interpretation of the 1941 contract. The interpretation of the 1932 license agreement, therefore, does not have any relevancy and materiality to any current issue, for howsoever it may be interpreted as defining the rights of the Fleischers, those rights were fully and completely transferred to Paramount. The Court concludes that Mr. Phillips' contact with the 1932 agreement may properly be disregarded for purposes of the present motion, because that agreement has no substantial relationship to any current issue.

With respect to the issues raised under the first cause of action, the Court clearly concludes that there is no basis to disqualify Mr. Phillips and his partners.

### V.

In spite of plaintiff's plangent iteration, the facts antecedent to the May

24, 1941 contract (between Paramount Pictures, Inc. and the Florida Fleischer corporation) as set forth in the first cause of action and in the plaintiff's motion papers, do not spell out proof of professional disqualification. With the disposition of the first cause of action, the central focus of the evidence shifts to plaintiff's charge of an antitrust conspiracy (as alleged in the second cause of action of the amended complaint and certain affidavits).

Defendants have asserted that plaintiff's cross-motion is "made in manifest bad faith" (Phillips' reply affidavit, p. 2), and is actually a retaliatory "afterthought" (ibid., p. 4). The timing of the anti-trust charge must be scrutinized. The sequence of events bears significantly on the issue not only of plaintiff's good faith, but also upon the prima facie factual merits of that conspiracy charge in so far as the present cross-motion is concerned, i. e., some showing, as distinguished from naked assertion, must be made out by plaintiff (as the cross-moving party) before his motion to disqualify may be granted.

We come thus to the questions posed by the chronology of events directly affecting the character of this motion. Was the conspiracy charge as pleaded in the second cause of action of the amended complaint added to the complaint in an effort to truss up the previously made motion? Do the papers in their present form furnish an adequate record for deciding the issues of plaintiff's credibility and the prima facie sufficiency of plaintiff's showing, or should a hearing be held herein to enable the Court to resolve critical issues of credibility?

To answer these questions, we must review the chronology. The original complaint was filed on October 14, 1957. On October 29, 1957, defendants filed their notice to take plaintiff's deposition and to require plaintiff to produce certain papers on November 12, 1957. By order to show cause dated November 4, 1957 and obtained by defendants, defendants sought to preserve their priority in the taking of depositions. By cross-notice of motion dated November 6, 1957, plaintiff moved to disqualify defense attorneys.

This November 6, 1957 cross-notice of motion was supported by Dave Fleischer's affidavit, which was sworn to November 4, 1957. The cross-motion was, by its notice, made returnable on November 7, 1957. On November 7, 1957, the cross-motion and other motions in the same case were adjourned to November 19, 1957, at which time said motions were argued at length.

In the period between the original return date (November 7) of plaintiff's cross-motion and the adjourned date (November 19) and on November 14, plaintiff filed an amended complaint. This amended complaint contained for the first time a "Second Cause of Action" based upon an alleged anti-trust conspiracy involving not only the defendants but (according to the pleading) the very attorneys whom plaintiff was seeking to disqualify in the pending but adjourned motion. The attorneys who are the objects of the disqualification motion were mentioned by name and specifically charged in the amended complaint with collusive, fraudulent and other improper acts purportedly directed against plaintiff, all of which acts are characterized luridly in the amended complaint and in plaintiff's post-argument affidavits.

Thus, Dave Fleischer's main cross-moving affidavit (sworn to November 4, 1957) is remarkable for the following three features: (1) there is completely lacking any reference to an alleged anti-trust conspiracy or any conduct in connection with such a conspiracy on the part of any of the defense attorneys; (2) plaintiff said he planned to amend his complaint in order to add Associated

Artists Productions, Inc. as a defendant in place of a misnamed defendant, P.R.M. Productions, Inc. and, further, in order to add as parties defendant Leo McCarey and his companies and corporations—there being not a word about adding a new cause of action based upon an alleged anti-trust conspiracy; and (3) plaintiff expressly and explicitly said (paragraph 10):

"The issues between Paramount and myself are governed by contract dated as of May 24, 1941 and will be resolved more as a matter of law than by extensive factual disputes, as your deponent is informed and verily believes."

From the foregoing it may be forcibly argued (as defendants do) that, *when the cross-motion was made,* there was no thought in the minds of plaintiff and his attorney of charging defense attorneys and the defendants with an anti-trust conspiracy, the alleged inception of which antedated May 24, 1941. (The starting date of the alleged anti-trust conspiracy was May 27, 1938.) The amended complaint—which is not verified and may not, therefore, be considered as an affidavit—sets forth the anti-trust conspiracy allegations in paragraphs 25 to 37. As noted, the amended complaint was filed on November 14, 1957.

The defendants' reply affidavits (affidavits of Louis Phillips and Seymour Shainswit, both sworn to November 15, 1957) were mailed for service on plaintiff's attorney on November 15, 1957—*before* Phillips and Shainswit had seen the amended complaint filed the day before but received by defendants' attorneys by mail on November 18, 1957. Hence, their affidavits do not refer to the anti-trust charge: the Fleischer November 4th affidavit upon which plaintiff cross-moved and the then outstanding complaint did not contain any charge of that character.

On November 19th, the adjourned return date of the cross-motion (and other motions), plaintiff's attorney served in open court upon defense attorneys a copy of his affidavit, sworn to November 18, 1957. This affidavit of Mr. Garfield is not based upon personal knowledge; does not set forth the sources of his information or the grounds of his belief; paraphrases, cites, and quotes from various paragraphs of the *amended* complaint with reference to the second cause of action, the newly added anti-trust cause of action; and emphasizes reliance upon the May 27, 1938 contract—as distinguished from the May 24, 1941 contract. This Garfield affidavit of November 18 is only an argumentative rehash of the amended complaint. It is a written edition of the oral argument that he delivered in court the following day, on November 19, 1957. That affidavit is an affidavit in form only. It actually is a legal memorandum. It possesses not the slightest evidentiary value.

Having admitted in the Dave Fleischer affidavit of November 4, 1957 that the issues were "governed" and would be "resolved" as a "matter of law" on the basis of the May 24, 1941 contract, plaintiff apparently decided (as defendants argue) to switch the attack from that basis because the attacked attorneys had *not* represented the Fleischers or their interests in the negotiation or execution of the May 24, 1941, contract. Plaintiff, therefore, had to launch his attack upon *another basis*—upon one in which the attacked attorneys did represent the Fleischers. This other basis the plaintiff found in the May 27, 1938 contract between Fleischer Studios, Inc. and Paramount, because the attacked attorneys are said by plaintiff to have represented the Fleischers as well as Paramount in the negotiation and execution of that contract. The contract of May 27, 1938 thus became the keystone of the second cause of action, the anti-trust conspiracy count.

According to plaintiff: Phillips "engineered" this contract; this contract was drawn and executed while Phillips

& Nizer were attorneys for Fleischer Studios, Inc. and Dave Fleischer; in that legal capacity, all of the contracts, statements and records of Fleischer Studios, Inc. were turned over to Phillips & Nizer and those lawyers still have those documents; and confidential communications were made by the Fleischers to Phillips & Nizer in connection with the May 27, 1938 agreement.

The May 27, 1938 agreement has *not* been presented to the Court by either party. The alleged terms of that agreement have been characterized and allegedly summarized in paragraphs 7 and 9 of the amended complaint and in Dave Fleischer's rebuttal affidavit (sworn to November 25, 1957), submitted after the oral argument of the motion on November 19, 1957.

The Dave Fleischer rebuttal affidavit (sworn to November 25, 1957) is only in formal and general terms "corroborated" by the affidavit of his brother, Max Fleischer, sworn to November 27, 1957. Since the latter affidavit adds no specific or separately averred facts, we proceed to consider in detail the Dave Fleischer rebuttal affidavit (sworn to November 25, 1957).

The Dave Fleischer rebuttal affidavit (which will be referred to as plaintiff's rebuttal affidavit) parallels the allegations of the amended complaint's second cause of action. According to the amended complaint (paragraph 27), the conspiracy started on May 27, 1938. That contract occupies a key position in the gravamen of the second cause of action (paragraphs 28, 29, 30, 31, 33, 34, 36, amended complaint). Paramount's attorneys and specifically "Phillips & Nizer" are mentioned as part of the conspiracy in the following paragraphs of the amended complaint: 28, 12 [by virtue of 34], 23(a), (b), (c), (d). The terms and purposes of the agreement are summarized and characterized in paragraphs 7 and 9 of the amended complaint.

Plaintiff's rebuttal affidavit (page 2e) states that "the facts" in the anti-trust cause of action "have in their background and as part of and to the conspiracy, the guilty and knowledgeable participation of Louis Phillips, the firm of Phillips & Nizer and the firm of Phillips, Nizer, Benjamin and Krim in the conspiracy to destroy the business of Dave Fleischer, Max Fleischer" and their New York and Florida corporations.

Page 2f to 2g-A of plaintiff's rebuttal affidavit states:

"The agreement dated as of May 27th 1938 was entered into by Fleischer Studios, Inc. and Paramount Pictures Inc., under the advice, guidance, counsel and suggestion of Louis Philips as our attorney as a solution to the problems which beset us in the years 1937 and 1938. It was only because of the confidential relationship of attorney and client then subsisting that we became such easy victims to the fraudulent conspiracy by which we, Dave Fleischer, Max Fleischer, and Fleischer Studios, Inc. were to be eliminated as potential competitors to Mr. Philips' more preferred client, Paramount Pictures, Inc. * * Our film library built up over a period of ten years, costing over ten million dollars, (1929 to 1938) presented a threat to the income of Paramount and its theatres, wholly owned or owned jointly with others, if released for television purposes. The overall purpose of Paramount was to prevent such anti-trust prohibited competition; to accomplish this objective it was first necessary to get a hold on our free assets. This was accomplished by the device of chattel and real property mortgage on all of our properties as security for the $100,000 advanced to us and borrowed by us, from Paramount, on the advice and counsel of Louis Philips our attorney, and

his assurance that the agreement which we were about to sign permitted us ten years within to pay off the costs of removal of our plant to Florida from the proceeds of the exhibition of the firms produced by us for exhibition by Paramount.

"The assurance of Louis Philips aforesaid was purportedly carried into the contract of May 27, 1938 as will be shown from its provisions about to be set forth (but such assurance proved to be a snare and delusion; in reality a trap for the unwary, * * *). Paragraph Eighth of the May 27, 1938 agreement is so worded as to create the false impression, conveyed to us by our attorney Louis Philips, and on the basis of which we undertook the production of the feature film 'Gullivers Travels' and the removal of our plant to Florida; its provisions are as follows:

* * * * * *

"The loan provisions of the agreement dated as of May 27, 1938 * * likewise make it clear that they are to be recouped from exhibition remuneration and amortized in accordance with Paragraph Eighth above set forth, except in the event that Paramount refused to exercise its options for further production of films, and declared the unrecouped balance due and owing."

Page 2g of plaintiff's rebuttal affidavit states:

"But we could never recoup the production costs of our films because of the monopolistic and anti-trust provisions of the agreement dated as of May 27, 1938, contained in paragraph Twelve (g) and (h) thereof, which gave Paramount sole discretion in distribution, with permission to block-book and exhibit in a manner since declared to be violative of the anti-trust laws of the United States in the decree of this court in United States vs. Paramount. * * * in furtherance of such anti-trust conspiracy, Paramount withdrew our Feature Cartoon, 'Gulliver's Travels' from general exhibition within one year of its release although it had obtained wide acclaim in the Press and had achieved a great public acclaim. Only the anti-trust practices of the defendant Paramount prevented us from recouping the cost of production of our feature and one-reel and two-reel cartoons; * * *

"On April 18, 1939 while Philips and Nizer were still our attorneys, and while the influence of such relationship of attorney and client was still a persuading factor in our relations with Paramount, Mr. Philips prepared and succeeded in having us execute an agreement of interpretation of the agreement interpretation, [sic] by which it was spelled out that the loans provided for under Part III of the agreement of May 27, 1938, in excess of $100,000. for the purpose set forth in Part III thereof shall be evidenced and secured by demand promissory notes, etc. * * * While the first step in our betrayal by Louis Philips was the procurement to sign the agreement as of May 27, 1938, hypothecating all of our property * * as security for the loans made necessary by his advice that we move out [sic] plant to Florida, the second [step] was this amendatory or supplemental agreement of interpretation, made while he was still our attorney and while we were under his influence.

"The coup de grace, the stab in the back by our former lawyer Louis Philips came on or about May 24, 1941, when our destruction was completed by Louis Philips, when our property was taken from us in furtherance of the conspiracy con-

ceived by him and executed under his guidance."

At page 2h, plaintiff's rebuttal affidavit states:

" * * * Mr. Philips did participate in the interment proceedings of me and my brother Max Fleischer, brought about by the coercive measures made possible by his inducement. * * * The default was engineered by calling the demand loans and demanding payment for the unrecouped balances, made so by the antitrust activities of Paramount in curtailing exhibition, block booking and other practices condemned in the decree of United States v. Paramount."

Keeping in mind the charges made by plaintiff in his *amended* complaint and *post*-argument affidavits, we take up the details set forth in the following papers submitted by defendants in opposition to plaintiff's cross-motion: (1) reply affidavit of Louis Phillips, sworn to November 15, 1957; (2) affidavit of Seymour Shainswit, sworn to November 15, 1957; (3) supplemental and rebuttal affidavit of Louis Phillips, sworn to December 12, 1957; (4) rebuttal affidavit of Bernard Goodwin, sworn to December 4, 1957; (5) rebuttal affidavit of Richard F. Murray, sworn to December 6, 1957; (6) rebuttal affidavit of Joseph Harris, sworn to December 4, 1957; (7) rebuttal affidavit of Louis Nizer, sworn to December 7, 1957; and (8) thirty-seven exhibits attached to the foregoing supplemental and rebuttal affidavits.

### Reply Affidavit of Louis Phillips Sworn to November 15, 1957

It must be noted: (A) this reply affidavit (while sworn to November 15, 1957, the day after the amended complaint was filed), is directed only to the *original* complaint and plaintiff's main cross-moving affidavit, sworn to November 4, 1957. The latter cross-moving affidavit contains nothing about the al-

leged anti-trust conspiracy, said to have been initiated with the May 27, 1938 contract "engineered" by Mr. Phillips; and (B) the *affidavits* submitted in plaintiff's behalf *that mention the alleged anti-trust conspiracy* were sworn to and served *after* Mr. Phillips' reply affidavit of November 15, 1957, viz., Garfield's affidavit (sworn to November 18, 1957); Dave Fleischer's rebuttal affidavit (sworn to November 25, 1957); and Max Fleischer's affidavit (sworn to November 27, 1957).

It is clear, as Mr. Phillips correctly states (p. 3), that (A) the action, *so far as it is based upon the first cause of action,* revolves around the legal construction of the contract between Paramount Pictures, Inc. and Fleischer Studios, Incorporated (of Florida), dated May 24, 1941; (B) that the plaintiff admits that "the issues" between defendant Paramount and him are "governed" by that 1941 contract; (C) that the defense attorneys did *not* represent any of the Fleischers or their interests with respect to any matter in issue founded in that May 24, 1941 agreement, and (D) that the miscellaneous proceedings antedating the May 24, 1941 agreement, *so far as they are relied upon in the first* cause of action, do not have any substantial relationship to the current issues.

The main cross-moving affidavit of the plaintiff and the original complaint affirm and ratify the May 24, 1941 contract. The amended complaint and the plaintiff's rebuttal affidavit disaffirm and repudiate the May 24, 1941 contract— as to which plaintiff was *not* represented by Mr. Phillips. Under the new theory advanced by plaintiff, plaintiff no longer regards the May 24, 1941 agreement as validly governing the issues between the parties. This shift by plaintiff has thus rendered the antecedent Phillips' reply affidavit responsive only to the charges in the first cause of action and not to the charges in the second cause of action.

The Phillips reply affidavit contains the following denials:

1. Mr. Phillips never received from the Fleischers (and does not possess) any of the papers requested for production on plaintiff's deposition (p. 3).

2. Plaintiff's good faith in making the cross-motion and in submitting Max Fleischer's affidavit is challenged in view of the following asserted facts:

(a) In prior conferences and proceedings herein, plaintiff and his attorney never raised a question of defense attorneys' qualifications to act as such (pp. 4–5, 20–21).

(b) Since June 1956, Max Fleischer, plaintiff's brother, has been the plaintiff in a New York State Supreme Court action against five of these defendants, where similar issues are raised with respect to the May 24, 1941 contract. In that parallel litigation, the defendants' attorneys (Phillips, Nizer, Benjamin & Krim) have conducted extensive proceedings and have served an extensive bill of particulars containing copies of the transactions and agreements between the Fleischers and Paramount. No issue of the propriety of defense counsel's acting as such has been raised therein (pp. 5–6, 20; Exh. A).

(c) Under date of June 20, 1956, Max Fleischer wrote a letter to Louis Phillips expressing his "personal regard, respect and friendship" for Mr. Phillips (pp. 6–7; Exh. B). This attitude is inconsistent with plaintiff's present claim and Max Fleischer's corroboration thereof (his affidavit of November 27, 1957) that the defendants and Mr. Phillips have destroyed and trampled upon both Fleischers' rights.

(d) The "jumbled and confused complaint underscores the untenability" of plaintiff's contentions (pp. 8–9).

3. Plaintiff's contention that the May 24, 1941 agreement established a relationship of pledgor and pledgee is belied by the express and explicit provisions of that agreement (pp. 9–10).

4. The plaintiff's references to the agreement of May 27, 1938 are "extraneous," and "meaningless"; "wholly academic and irrelevant" (p. 10) because the May 24, 1941 agreement (paragraph First thereof) explicitly terminated and cancelled all prior agreements between the parties and their respective predecessors in interest.

5. There were no "confidences" acquired by Mr. Phillips in the course of prior representations of the Fleischers "which in any way bear upon" the issue of the legal construction of the May 24, 1941 agreement (pp. 10–11, 17).

6. Neither Mr. Phillips nor any members of his firm represented any of the Fleischers or any of their interests in the negotiation and execution or any aspect of the May 24, 1941 agreement. The Fleischers were represented by their regular personal attorney, the late N. William Welling, of 233 Broadway, in connection with every aspect of the May 24, 1941 agreement. Mr. Welling was in no wise associated with Mr. Phillips, et al. (pp. 11–12; Exh. C).

7. In the Helen Kane case (covering the years 1932 to 1934), the Fleischers were represented by their attorney, N. William Welling, and not by Mr. Phillips; and, moreover, that litigation has no relationship to any of the issues in the present case (pp. 12–15; Exhs. D, E, F).

8. Mr. Phillips does not have any recollection of representing the Fleischers in negotiating the 1932 license agreement with King Features Syndicate. In any event, there is no relationship between that agreement and the current issues (pp. 16–17).

9. Mr. Phillips makes the blanket denial that the Fleischers divulged to him "innermost confidences" which "are in any way even remotely involved in this litigation" (p. 17).

10. The Kallus case litigation in 1938 is not related to the present controversy. Phillips & Nizer represented Fleischer Studios, Inc. in that litigation which, however, is unrelated to the current issues (pp. 17–19).

11. Mr. Phillips' reply affidavit claims that Items 2(a) and 4 (designated in defendants' notice) have only "limited pertinency" to the present lawsuit. With respect to Item 2(a), Mr. Phillips' expressed position is: [A] The papers requested in this Item 2(a) related to the "pivotal" question whether plaintiff "has any interest and standing to maintain this suit," the subsidiary questions being whether Max Fleischer—as distinguished from the plaintiff Dave Fleischer—is the sole distributee of the successor Florida corporation and what are the "respective interests" of Dave and Max in the original New York corporation and "in the production of literary works" by the New York corporation (pp. 23–24). [B] The papers requested in this Item 2(a) are "the usual corporate paraphernalia—which manifestly bear a very tangential relationship to the subject matter of this lawsuit" (p. 24).

With respect to Item 4(a) and (b), Mr. Phillips' expressed position is: [A] The papers requested in this Item 4(a) and (b) are "plaintiff's duplicating copies or originals of the license agreements merely further to establish the simple fact * * * spelled out in the license agreements" that the Fleischer corporation did not have "any right to televise or cause to be televised, the 'Popeye' and 'Superman' film cartoons produced pursuant to said licenses" (pp. 24–25). [B] The papers requested in this Item 4(a) and (b) are so requested in order to have plaintiff "merely to concede the *actuality* of the contracts—nothing more" (p. 25). [See also p. 52 of Phillips' rebuttal affidavit, with respect to Item 4(b).]

Affidavit of Seymour Shainswit
Sworn to November 15, 1957

This affidavit is confined to an attack upon the good faith of the cross-motion, adopting Mr. Phillips' position in that respect.

Supplemental and Rebuttal Affidavit
of Louis Phillips Sworn to
December 12, 1957

This 59-page affidavit is largely devoted to the following denials:

[A] Mr. Phillips did not counsel and advise the removal of the Fleischers' activities to Florida (p. 5).

[B] The May 24, 1941 agreement was an "arm's length transaction" in connection with which the Fleischers were represented throughout by the late N. William Welling and Albert Spar (pp. 6–7, 9, 24–25).

[C] "* * * plaintiff has invented a story that" an "option exercised by Paramount dated May 19, 1941" was "pursuant to an agreement of May 27, 1938 and effected a seizure of the Fleischer corporation's assets"—whereas, in truth and in fact, the exercised option had been granted "pursuant to an agreement of May 12, 1937" (pp. 7–8; Exhs. B, C, D).

[D] At page 2h of Dave Fleischer's rebuttal affidavit (sworn to November 25, 1957), Dave Fleischer states that the May 24, 1941 agreement was prepared "without representation by me [Dave Fleischer] or any lawyer on my behalf or any lawyer on behalf of Fleischer Studios, Incorporated." This statement is flatly denied (see [B] supra) and that statement is also sharply challenged by the rebuttal affidavits submitted in behalf of defendants by Bernard Goodwin and Richard F. Murray (pp. 12–15, 24–25; Exhs. E, F, G, H, I, J, K, L, M, N).

[E] Plaintiff's "present version of seizure, conspiracy, fraud and similar baseless accusations" is belied by a

"friendly exchange" of letters between Paramount and Max Fleischer in May 1942 (p. 15; Exhs. O and P); and by Mr. Garfield's letter of November 16, 1956 (pp. 26–29; Exh. EE).

[F] Plaintiff's "present posture of seizure, confiscation, fraud and all his other similar baseless accusations" is further belied by plaintiff's "cordial response" of May 27, 1942 (Exh. R) to the letter of Sam Buchwald (Exh. Q) advising plaintiff, Max Fleischer and Mr. Welling (Fleischers' lawyer) of Paramount's intent not to renew their employment of Fleischer Studios after May 24, 1942 (pp. 16–17a).

[G] "Not a single one" of the claims now set forth in the amended complaint was ever made by the Fleischers during "all the intervening years" (pp. 17a, 24).

[H] Although Max Fleischer, in June 1956, commenced a New York Supreme Court action against Paramount and other identical defendants herein, that complaint did not contain any of the present accusations (pp. 17-a; 26).

Moreover, under date of June 29, 1956, Max Fleischer wrote to Mr. Phillips that, so far as he [Max Fleischer] is concerned his "personal regard, respect and friendship for you [Mr. Phillips] cannot be affected" (p. 18).

[I] Contrary to the present accusations made by the Fleischers, the documentary evidence shows that the Fleischers maintained high regard for and close friendship with Mr. Phillips, who manifested his continuous interest in the Fleischers' welfare (p. 17-a; Exhs. S, T, U, V, W, X, Y, Z, AA, BB; Bernard Goodwin affidavit sworn to December 4, 1957, pp. 2, 5).

[J] The December 20, 1955 letter agreement between Paramount and Max Fleischer (Exh. A annexed to the amended complaint) "confirms the continuous close and friendly relationship between Max Fleischer * * * and Paramount" (p. 17-b). As late as January 30, 1956, Max Fleischer's attorney

sent to Paramount an unsolicited letter proposing an indemnity agreement in favor of Paramount (pp. 17-b, 17-c; Exh. KK).

[K] Paramount's requested production of the Fleischer corporation's duplicate original or copy of the February 17, 1937 license agreement with King Features was designed only to establish that that agreement provided that no right to televise the "Popeye" cartoons had been given to Fleischer Studios, Incorporated (pp. 19–21; Exh. CC, paragraph Fourth, p. 15).

[L] The cross-motion is a mere afterthought (pp. 32–33).

[M] With respect to the contract of May 27, 1938, the Phillips' rebuttal affidavit states that plaintiff's "newly conceived accusations" are deliberately false (p. 54).

Rebuttal Affidavit of Bernard
Goodwin Sworn to December 4, 1957

In general, this affidavit corroborates the position taken by Mr. Phillips. A reference to the drafting of "the May 27, 1938" agreement is not entirely clear (pp. 2–3).

Rebuttal Affidavit of Richard F.
Murray Sworn to December
6, 1957

This affidavit supports the views expressed by Mr. Phillips. The following specific reference (p. 3) is made to the May 27, 1938 contract:

"The officers of Paramount ultimately decided to permit the Fleischers to move their studio to Miami. Louis Phillips had nothing whatever to do with any of the financial details involved in this removal, nor with the contract dated as of May 27, 1938, which envisaged the move to Florida. With Louis Diamond, my superior, I worked out with the Fleischers all of the financial details necessitated by the

removal. Bernard Goodwin of Paramount's Legal Department drafted the May 27, 1938 agreement and all other requisite legal documents."

Rebuttal Affidavit of Joseph Harris, Sworn to December 4, 1957

This affidavit is confirmatory of Mr. Phillips' assertions.

Rebuttal Affidavit of Louis Nizer Sworn to December 7, 1957

This affidavit (p. 2), in referring to the agreement of May 27, 1938, states that Mr. Nizer does not recall whether his firm "solely handled this matter, or in collaboration with the Fleischers' regular, personal attorney—N. William Welling."

### VI.

The foregoing analysis of the entire record demonstrates:

1. The papers in their present form constitute an adequate record for deciding the issues of plaintiff's credibility and the prima facie sufficiency of plaintiff's showing. Plaintiff is unreliable and incredible as a witness so far as concerns his cross-motion. Plaintiff has failed to sustain his burden of proof of establishing a prima facie basis for said motion.

2. The affidavits submitted in behalf of plaintiff use conclusory language instead of evidentiary facts in dealing with essential features of plaintiff's charges against the defense attorneys.

3. Although plaintiff relies on the May 27, 1938 contract, he has failed to submit to the Court a copy of this contract.

4. According to plaintiff, the alleged anti-trust conspiracy started on May 27, 1938, when the aforesaid contract was executed. Yet, during the passage of the twenty years since May 27, 1938, plaintiff apparently did nothing and said nothing about the alleged conspiracy.

5. Plaintiff's affidavits do not state when and how he first discovered the alleged conspiracy. If plaintiff knew of the alleged conspiracy before he made the instant cross-motion, plaintiff does not explain why he failed to refer to it on November 6, 1957, when he filed the present cross-motion. The first reference to the alleged anti-trust conspiracy was made by plaintiff after the present cross-motion was filed. This time sequence casts a shadow upon the credibility and good faith of plaintiff in making this cross-motion to disqualify. The Court is of the clear opinion that the second cause of action of the amended complaint was added in an effort to truss up the previously made motion.

6. Plaintiff's cross-motion rests virtually alone on plaintiff's own affidavits. The affidavits of plaintiff's attorney do not constitute corroboration for the reasons already indicated. The affidavit of Max Fleischer is only *pro forma* corroboration. As already noted, Max Fleischer himself has been and is presently the plaintiff in a parallel New York state court action; and in said state court action Max Fleischer has not taken the position vis-a-vis defendants' attorneys which is now espoused in his so-called corroborating affidavit herein.

7. The position of the Fleischers as set forth in the present cross-motion is clearly inconsistent with various letters written and signed subsequent to May 27, 1938, in which friendly and cordial feelings were expressed toward the defendants and defendants' attorneys, who are now attacked by the Fleischers. This inconsistency of position raises an adverse inference as to the good faith and credibility of plaintiff.

Plaintiff's cross-motion is denied in all respects. This decision shall constitute an order.