216 F.2d 920
 52 A.L.R.2d 1231
 CONSOLIDATED THEATRES, Inc., and Philip Loew, Plaintiffs,
v.
WARNER BROS. CIRCUIT MANAGEMENT CORPORATION, Warner Bros.
Pictures, Inc., Universal Pictures Company, Inc., United
Paramount Theatres, Inc., United Artists Corporation,
Twentieth Century-Fox Film Corporation, RKO Radio Pictures,
Inc., Radio-Keith-Orpheum Corporation, Paramount Pictures,
Inc., Paramount Pictures Corporation, and Loew's
Incorporated, et al., Appellees-Defendants-Petitioners.
In re Proceedings to Disqualify Robert E. NICKERSON, and the
Firm of Gold & Nickerson, from Acting as Attorneys
for the Plaintiffs in the Above-Captioned Case.
 No. 235, Docket 22924.
 United States Court of Appeals Second Circuit.
 Argued June 8, 1954.
Decided Sept. 28, 1954.
Motion to Recall and Amend Mandate Nov. 19, 1954.
 
 E. Compton Timberlake, John F. Caskey, William F. Koegel, Dwight, Royall, Harris, Koegel & Caskey, New York City, for appellees-defendants-petitioners.
 Robert E. Nickerson, Greenwich, Conn., appearing pro se, as appellant-respondent.
 Before CHASE, Chief Judge, and FRANK and HINCKS, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 This appeal arises from a proceeding to disqualify Robert E. Nickerson and the law firm of Robert E. Nickerson and William Gold from acting as attorneys in a private motion picture anti-trust suit. The facts of the case are as follows: Philip Loew and Consolidated Theatres, Inc., retained the law firm of Nickerson and Gold to institute an antitrust action against a large number of motion picture producers. Messrs. Nickerson and Gold drafted a complaint alleging that the defendants had seriously damaged a theatre owned by Loew and leased and operated by Consolidated Theatres, Inc., which was located in Worcester, Mass., by denying it first run quality films. The complaint charged a nation-wide conspiracy in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. The complaint charged that each of the named defendants have engaged in unlawful practices pursuant to the nation-wide conspiracy, and that such practices were found against each of them in the judgment in the famous United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The complaint prayed for treble damages in the amount of ten million dollars in favor of Consolidated Theatres, Inc. and four million dollars in favor of Philip Loew.
 
 
 2
 The defendants objected to participation by plaintiff's counsel in the case and moved that they be disqualified as attorneys. This aspect of the case was referred to a Special Master whose report recommended that the challenged attorneys be so disqualified. The report was adopted by the District Judge and from his order Mr. Nickerson has taken this appeal.
 
 
 3
 The law firm of Nickerson and Gold is challenged in this case because of the former activities and associations of Mr. Nickerson. Stated broadly, the essence of the claim is that Mr. Nickerson had formerly served as an attorney in a large law firm which represented the defendants herein. The charge is that, in his capacity as plaintiff's counsel in the instant case, he represents an interest which is adverse to that of clients of his former firm, and that such conduct is a breach of professional ethics.
 
 
 4
 In order to decide the questions of law presented, it is necessary that we set out some of the findings of fact made by the Special Master. The findings which we include are those supported by the evidence and not materially disputed by the parties.
 
 
 5
 In 1942 Mr. Nickerson was employed as an attorney in the law firm of Dwight, Royall, Harris, Koegel and Caskey (hereinafter called the Dwight firm). He remained as an employee of the firm for a period of eight years and in 1950 formed a partnership with Mr. Gold. About eighty percent of his work in the Dwight firm involved motion picture anti-trust matters. One of the principal clients of the Dwight firm is the Twentieth-Century Fox Film Corporation (hereinafter called Fox) which is a defendant here.
 
 
 6
 The charge against Mr. Nickerson is principally based on his participation in three motion picture anti-trust suits while in the employ of the Dwight firm. One such case is United States v. Griffith Amusement Co., 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236. This case was instituted by the Government in 1938 and the complaint therein, as appears from the Supreme Court opinion, charged that, '* * * certain exclusive privileges which these agreements granted the appellee exhibitors over their competitors unreasonably restrained competition by preventing their competitors from obtaining enough first- or second-run films from the distributors to operate successfully. The exclusive privileges charged as violations were preemption in the selection of films and the receipt of clearances over competing theatres. It also charged that the use of the buying power of the entire circuit in acquiring those exclusive privileges violated the Act.' 334 U.S. 100, 68 S.Ct. 941, 943.
 
 
 7
 Originally, Fox had been a defendant in the Griffith case. Pursuant to a consent decree, it and several other motion picture companies were dismissed as defendants, but in the amended complaint they had been named as co-conspirators. In that case, in addition to representing Fox, the Dwight firm was retained by Paramount Pictures, Inc., Warner Brothers Pictures, Inc., R.K.O. Radio Pictures, Inc., and Loews, Inc. (hereinafter these four companies are designated as the 'group'). Each member of the 'group' is a defendant in the instant case.
 
 
 8
 Fox and the group were, upon subpoena, required to produce thousands of documents at the Griffith trial. The Dwight firm was retained to aid in this process and generally to advise the Griffith attorneys. The Special Master found that Mr. Nickerson's primary responsibility in the Griffith case was 'largely in arranging the files of these companies for presentation to the Court, attending the trial, making notes of the testimony, and the general proceedings of the trial * * *.' Nickerson admitted that he had complete access to all the records and files of Fox and the group. He interviewed employees of some of the group companies, and with another lawyer conducted an interview with Paramount's branch manager, who was instructed to 'give them your co-operation in obtaining all the facts which they seek.' The Special Master also found that '* * * one of the main purposes of his endeavors was to get findings which would make it difficult for private litigation to be instituted' against Fox and the group. The Master found that some files entrusted to Nickerson included policy statements on the selling, releasing and withholding of pictures.
 
 
 9
 Another case in which Nickerson participated is United States v. Schine Chain Theatres, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245. Fox and the group were originally named as defendants in this case also but under the consent decree they were dismissed as such. But as in the Griffith case, they were still charged as coconspirators. They were required to respond to a subpoena duces tecum calling for huge quantities of documentary and other evidence. They retained the Dwight firm which put Nickerson on the 'team' that worked on the case. The issues in the Schine case were substantially similar to those in the Griffith case, a key question being, in the words of the Special Master, whether '* * * the Schine defendants had conspired with the distributor defendants * * * by obtaining first and preferred runs over competing theatres.' Nickerson's activities in the Schine trial were quite similar to those assigned to him in the Griffith case-- analyzing, digesting, and organizing files containing documentary evidence. He was present at interviews of sales and branch managers of Fox and the group companies. He also helped witnesses prepare to give testimony at the trial. Also, in McLendon v. Loews, Incorporated, D.C.Tex., 76 F.Supp. 390, a suit involving Fox and the group, Nickerson helped in obtaining data on the facts in preparing the case for trial. The Special Master discussed other matters on which Nickerson worked while associated with the Dwight firm involving Fox especially, and in some instances members of the group. He never was the attorney of record in any of these cases, and always was assigned as an assistant to one of the senior partners in the Dwight firm.
 
 
 10
 Mr. Nickerson, whose good faith and moral character was in no way challenged in this proceeding, realized that he was under certain ethical obligations to the Dwight clients. Before leaving the Dwight firm he discussed the matter quite extensively with a partner of the firm. From these discussions emerged what Nickerson calls the 'Caskey-Nickerson Agreement.'
 
 
 11
 This was an informal understanding between Mr. Caskey, a member of the Dwight firm, and Nickerson which had been reached, on the eve of Nickerson's separation from the firm, as to the extent to which in the future Nickerson would be free to represent interests adverse to those who had been clients of the firm while Nickerson had been associated therewith. Under this 'Agreement,' Nickerson in the words of the Special Master, was to refrain 'from accepting work in areas and in periods of time in which Nickerson was employed by Dwight, Royall, Harris, Koegel and Caskey against clients for whom such work was performed.'[1]
 
 
 12
 Further, in the hearing before the Special Master, the appellant testified that in the instant case he voluntarily accepted certain limitations upon his conduct in prosecuting the case against Fox and that it was his intent not to press Fox for pre-trial disclosure by deposition or interrogatory.
 
 
 13
 The defendants urge disqualification of the law firm of Nickerson and Gold in this case under Canons 6 and 37. American Bar Association, Canons of Professional Ethics.[2] We incline to accept the appellant's contention that each of the above Canons must be considered independently within the factual framework of the case; that conduct is not necessarily unprofessional which collides with fragments only of one or more canons. We address ourselves to Canon 6, which we set out in full in the margin.[3]
 
 
 14
 Here, we are particularly concerned with the third paragraph of Canon 6, which directly raises the question whether Mr. Nickerson's representation of the plaintiffs in the Worcester case is one 'adversely affecting any interest of the former client (i.e. Fox and the group) in respect to which confidence has been reposed.' As to this, we do not blink the fact that there were no findings below-- and perhaps no evidence-- (1) of specific information given by their former clients to the Dwight firm, (2) which was of essentially confidential nature, (3) whichever passed into the knowledge of Nickerson while in the employ of the Dwight firm, (4) the use of which in the Worcester case would adversely affect Fox or the group. There was thus no direct evidence that Nickerson was subject to the obligation of the third paragraph of Canon 6. However, there is no suggestion in the Canons that to invoke an obligation defined therein the proof thereof must be by direct evidence. We think that the professional obligation therein defined, like any legal relationship, may be established by reasonable inference.
 
 
 15
 It was so held in a well reasoned opinion by Judge Weinfeld in T C. Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y., 113 F.Supp. 265. There, on page 268, it was said that to prove the existence of the professional obligation:
 
 
 16
 '* * * the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client.'
 
 
 17
 That was a treble damage suit under the anti-trust laws of the United States. And at least as applied to that case we think Judge Weinfeld's statement was correct. The statement, it will be noted, was not a rule of substantive law purporting to define the professional obligation. It went no further than to measure the quantum of evidence required for proof of the obligation.[4]
 
 
 18
 Bases for similar inferences were available to the Master here. From the fact that Mr. Nickerson, when assigned by the Dwight firm to work on cases in which the firm had been retained by Fox and the group, received or had access to information furnished by those clients, who were distributors of motion-picture films, in connection with their defense to treble damage actions brought by exhibitors, we think that the Master might reasonably infer that some at least of that information was confidential. Here the Worcester case involved matters substantially related to matters involved in the previous Griffith and Schine cases. It is true that there are differences of time and plaintiff-locale; and in the Worcester case a nation-wide conspiracy is charged, whereas in Griffith and Schine the charges were somewhat more restricted. But the differences were not crucial: they were far outweighed by the similarities. The Master, therefore, might properly infer that the information, if used in the Worcester case, would have an effect adverse to the distributors. Thus the existence of a professional obligation and its breach were sufficiently proved and the disqualification must be sustained.[5] The fact that information of adverse impact thus received has not been used as yet, or may never be so used, should not obscure Nickerson's obligation not to accept a retainer such as that covering the Worcester case.[6]
 
 
 19
 In so ruling, we are not unmindful of the drastic effect of the Canon on a lawyer of Mr. Nickerson's background. It comes close to preclude him as serving as a plaintiff's attorney in the lucrative anti-trust motion-picture field in which he has specialized during most of his professional life. However, it will not do to overemphasize the hardship which, after all, is an inevitable incident to his own choice of profession and choice of employment. But that aside, the specialized field is but a fragment of the overall field still open to him in which much of his general accumulated experience can find useful outlet.
 
 
 20
 But whatever the dimensions of the incidental hardship, the American Bar Association, as also the courts throughout the country which have incorporated the Canons into their rules of court, were primarily concerned for the public good which was deemed to require assurance, as specific as possible, of the confidence inherent in the client-attorney relationship. Doubtless it was also considered desirable that the Bar should have in convenient form a code of professional ethics for its guidance. But we think that fundamentally the Canons must be viewed not as a Bill of Rights for the Bar but, rather, a codification of the more important limitations on legal practice broadly deemed necessary for the protection of clients.
 
 
 21
 Perhaps in certain situations, to prevent hardship to a lawyer not necessary to the protection of the client, the technique suggested in Bricheno v. Thorp, Jacob 300, 37 Eng.Rep. 864 (1821), might be feasible. It was there suggested that the Judge might hold a session in camera, by means of which he might ascertain, without attendant publicity, the content of prior disclosures by the client and determine whether their use in the pending litigation might reasonably be expected to be adverse to the interests of the former client. But such technique we think would have been completely lacking in feasibility for application to the situation here involved. The formidable dimensions of anti-trust suits and the proliferation of the sub-issues involved is well known to Bench and Bar. On a motion for disqualification in such a suit, a requirement that the client must disclose the specific content of all information disclosed in confidence, the session in camera envisaged in the Bricheno case would not serve to avoid a vast addition to the burden of the court and the parties. In the instant case 724 pages of testimony were taken at the hearing before the Master. It is a safe guess that the volume of evidence, not to mention the judicial burden, would have been vastly greater if the clients, to establish the professional obligation which was created for their protection, had been required to establish the specific content of the information on which they relied.[7]
 
 
 22
 The appellant, by brief, refers to other instances in which lawyers without challenge have accepted retainers by exhibitors to sue distributors whom they theretofore had professionally represented. But for aught that we can tell the absence of challenge in those cases was attributable to an implied consent by the clients to the adverse representation based, perhaps, on the clients' knowledge that any prior disclosures made by them would not be injurious if used in the later suit. However that may be, such practice, if without the sanction of consent, demonstrates not that the practice is consistent with the Canon, but rather that the Canon, at least in this limited field, has been more honored in the breach than in its observance. This opinion will show that, unless consented to, such practice, if indeed it exists, has the firm disapproval of this court.
 
 
 23
 Appellant contends that while in the employ of the Dwight firm he was, though admitted to the Bar, a mere law clerk and that Canon 6 only extends to those attorneys who deal with the client in a face to face relationship or who conduct the trials. The Special Master found that the appellant 'underestimated' his value to the firm and that his real capacity was that of associate counsel. We do not think that titles have much to do with the real problem here. Canon 6 is devised to protect the secrets and confidences reposed in the attorney by his clients. It is the work done for the client and the access to the confidential information of the client which is crucial in determining whether the obligation of Canon 6 arises. Regardless of whether Mr. Nickerson, concededly an attorney at law, was a law clerk or not, in the Schine and Griffith cases, which involved matters substantially similar to the instant case, he had access to the files of Fox and of the 'group' and he performed other services for the group-- all defendants in the instant case-- which might well have brought him into contact with confidential information. That was enough, we hold, to give rise to the obligation of Canon 6.[8]
 
 
 24
 The fact that Canon 37 was not promulgated until long after Canon 6 is sufficient answer, we think, to appellant's argument that the express recognition, in Canon 37, that the lawyer's obligation extends 'to his employees' imports an intent that Canon 6, which says nothing about a lawyer's 'employees,' does not apply to law clerks. If, as we hold, Canon 6, in 1908, should be interpreted to apply to 'employee' lawyers, we know of no subsequent social or economic developments which suggest that it should now have a more restricted scope. One may surmise that by 1929 the increased number of lawyers whose recompense derived from salary rather than direct retainer explains the express inclusion of the sub-class in Canon 37.
 
 
 25
 The appellant raises another point which, if valid, would prevent disqualification under Canon 6. It is claimed that Fox had consented to representation of the plaintiff by the firm of Gold and Nickerson. In support of this contention, the appellant invokes a conversation between Fox's Vice President and himself. After being advised of the 'Caskey-Nickerson Agreement' referred to above, Fox's Vice President said: 'I did not know you felt any restrictions at all. I thought you were just going high, wide and handsome against Fox, and now that you tell me what you do, I suppose that should be your line of demarcation.' We think that this statement is far too ambiguous to have weight as evidence of a consent by Fox to the appellant's activity. Nor can we agree that the 'Caskey-Nickerson Agreement' was binding on Fox and thus estopped it from moving to disqualify Nickerson. Even if Caskey, as attorney for Fox, told Nickerson that he would not be restricted at all in future litigation, Fox had power to terminate that consent. Surely, an attorney's power of representation is confined to the matters which have been entrusted to him, in the absence of express authority for more general representation. Nickerson could not take his 'agreement' with Caskey as a commitment by Fox running into the indefinite future. We also find no basis for an estoppel growing out of Fox's action in entering into a settlement of a claimed infraction of the Paramount decree with the plaintiff, who was represented during the compromise proceedings by Nickerson and Gold. We hold, therefore, that the contention of consent by Fox to appellant's present activity in behalf of the plaintiffs has not been substantiated.[9]
 
 
 26
 Since we think that the appellant and his firm of Nickerson and Gold were properly disqualified under Canon 6, it is unnecessary for us to consider the contentions raised under Canon 37. While so holding we wish to make it clear that we, like the Special Master, recognize that Mr. Nickerson's conduct in the Worcester case and his position as asserted throughout the disqualification proceedings do not warrant any reflection on his good faith or moral integrity. His conduct stemmed from undue reliance upon assurances as to the future scope, ethically permissible, for his professional activities after severance from the Dwight firm-- assurances apparently emanating from a senior in that firm in whose judgment it was natural for him to rely. And this aside, we do not blink the fact that heretofore there has been no reported judicial decision in this country as to the impact of Canon 6 on a situation similar to that invoked in this case.
 
 
 27
 We think that the record justifies only disqualification as to Fox and the 'group,' the latter including Warner Brothers Pictures, Inc., Paramount Pictures, Inc., R.K.O. Radio Pictures, Inc. and Loew's, Inc. The other six defendants were not clients of the Dwight firm while Nickerson was in that firm's employ and there is insufficient evidence to link Nickerson's professional past with them. On this acount, the basis of our holding is narrower than that recommended by the Master. But we agree with the Master, and hold, that as long as Fox and the 'group' are defendants in the Worcester case the appellant personally, and any firm with which he may be associated, are disqualified from participating in any guise or way.
 
 
 28
 Affirmed.
 
 
 29
 On Motion by Appellant to Recall and Amend Mandate
 
 
 30
 Before CHASE, FRANK and HINCKS, Circuit Judges.
 
 
 31
 PER CURIAM.
 
 
 32
 Being satisfied, on the motion papers, that under the facts presented there was no reasonable need for printing the appendix to appellees' brief, it is ordered that the motion be granted and that upon the recall of the mandate the Clerk be instructed to delete the item of $238.19 which was taxed against the appellant on account of the cost of that printing.
 
 
 33
 In so far as the motion seeks further revision of the order on mandate, it must be denied. The order correctly reflects our holding that the appellant and his firm are disqualified from participating as counsel in the main case, because of the appellant's prior relations with Fox and the 'group' who are defendants in that case. It is true that the reasoning and language of our opinion imports that nothing in the record here precludes the appellant from conducting litigation against those defendants here which are not members of the 'group.' But it is not within the province of a judgment of this court or of an order on mandate to adjudicate rights not involved in this particular case.
 
 
 34
 Ordered accordingly.
 
 
 
 [1]
 The Master's report continues in referring to the restriction under the 'Agreement':
 'As to Fox, he (Nickerson) says, 'This means many areas and many time periods, not including Worcester, except possibly for the effect of the 1943 Worcester arbitration.'
 'As to Paramount, he says, 'This means Dallas, the Schine towns and the Griffith towns, for the periods involved in these actions, not including Worcester at all.'
 'As to time, the stricture terminates, no later than October 1, 1950, when Nickerson left Dwight's employ.
 'He stated he was going to refrain from introducing into any case against Fox any material which was involved on a geographical and time basis in connection with which he had any connection. He did not intend to offer, for example, adjudications in the case of Milwaukee Town (Milwaukee), Goldman (Philadelphia), Bigelow (Chicago) or Ball (Ambridge) cases against Fox; that he would not use the Federal Trade Commission proceedings in San Francisco, Oakland and Los Angeles against Fox, * * *'
 
 
 [2]
 See Rule 5, Subdivision c of the General Rules of the United States District Court for the Southern District of New York, whereby the Canons were adopted as rules of court
 
 
 [3]
 'Canon 6. Adverse Influences and Conflicting Interests
 'It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
 'It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.
 'The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.'
 
 
 [4]
 In the T. C. Theatre case, Judge Weinfeld denied the application of Paramount to disqualify the plaintiff's attorney: his order went no further than to preclude further participation in the case by plaintiff's attorney as long as Universal was a party. However, Paramount interests thereafter sought a rehearing and reconsideration of its motion. This application was denied by Judge Weinfeld in a brief supplemental memorandum, 125 F.Supp. 233. Since the effect of this order was to leave plaintiff's counsel free to press the case against the Paramount defendants, provided Universal were no longer a defendant in the case, the appellant here insists that that order constituted a firm precedent for the denial of the motions to disqualify him in the instant case
 We cannot agree. That the facts stated in Judge Weinfeld's original opinion were not enough to justify disqualification as to Paramount, is implicit in his order: we hardly think Judge Weinfeld intended by his supplemental memorandum to recede from the rationale of his original decision. And no supplemental findings were included in his brief supplemental memorandum just referred to. Even if we were to take into account the conflicting evidence, wholly extraneous to the instant case, which the appellant has appended to his brief, and which the appellant says was before Judge Weinfeld, we cannot know how Judge Weinfeld would have found the facts. Thus we cannot know whether the situation in the instant case was in all essential respects the same.
 In his supplemental memorandum Judge Weinfeld stated that at the prior hearing, 'the emphasis was completely upon the Universal situation and the services performed by him (i.e. plaintiff's attorney) on its behalf.' It is thus plausible to believe that Judge Weinfeld may have concluded that Paramount's attorney, who after absence at the original hearing applied for reargument, was belatedly attempting to raise an issue not squarely presented at the original hearing and denied the application on that ground. Or it may be that Judge Weinfeld's ruling reflected the view that a prior relationship with Paramount-Publix Corporation was not enough to bar activity, after the Paramount-Publix bankruptcy, adverse to its successor corporations-- a condition which has no parallel in the instant case. And finally, even if Judge Weinfeld's denial of reargument was in effect in conflict with his earlier reasoning we think his first expression was correct.
 
 
 [5]
 For enforcement of the principles implicit in Canon 6, see In re Boone, C.C.N.D.Cal., 83 F. 944, Hatch v. Fogarty, 40 How. Prac., N.Y., 492, Gesellschaft Fur Drahtlose Telegraphie M.B.H. v. Brown, 64 App.D.C. 357, 78 F.2d 410, Watson v. Watson, 171 Misc. 175, 11 N.Y.S.2d 537, and United States v. Bishop, 6 Cir., 90 F.2d 65. See also the comprehensive analysis of Canon 6 in 'Legal Ethics,' page 103, et seq., 1953 Columbia University Press, New York, by Henry S. Drinker, a member of the Philadelphia Bar and Chairman of the Standing Committee on Professional Ethics and Grievances of the American Bar Association
 
 
 [6]
 See T. C. Theatre Corporation v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y., 113 F.Supp. 265; Porter v. Huber, D.C.W.D.S.D.Wash., 68 F.Supp. 132; Brown v. Miller, 52 App.D.C. 330, 286 F. 994, and People v. Gerold, 265 Ill. 448, 107 N.E. 165. Appellant cites Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co., C.C.S.D.N.Y., 93 F. 197. We think this case superseded by the Canons of Professional Ethics. It was decided before 1908 when Canons 1 through 32 were first promulgated. And it may be noted that Canons 33 to 45 were first adopted by the American Bar Association in 1928. See A. B. A. Canons of Professional and Judicial Ethics, 1947, Foreword, p. IX. We also think that the case fails to meet the superior reasoning of the cases cited above
 
 
 [7]
 However, our holding in this case will not preclude use of some such technique as was suggested in the Bricheno case if and when a trial judge is confronted with a disqualification application in a case the circumstances of which lead him to feel that fairness to a challenged lawyer can be achieved without undue burden to the former client by requiring a somewhat higher degree of proof than that which we hold to have been sufficient in the situation here
 
 
 [8]
 Appellant relies on Gaver v. Early, 58 Cal.App. 725, 209 P. 390. This case in no way discusses Canon 6 and is distinguishable for numerous reasons, chief of which is that it does not appear that the clerk worked, while in the employ of his former firm's client, on matters substantially similar to those involved in the suit in which he was challenged as an attorney
 
 
 [9]
 It will be noted, however, that even if by Fox's consent the appellant was free to prosecute Fox, he will nevertheless be disqualified from prosecuting the members of the group