**SILVER CHRYSLER PLYMOUTH, INC., Plaintiff,**

v.

**CHRYSLER MOTORS CORPORATION and Chrysler Realty Corporation, Defendants.**

**No. 73-C-853.**

United States District Court, E. D. New York.

Nov. 26, 1973.

Hammond & Schreiber, New York City, for plaintiff.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendants; Robert Ehrenbard, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Defendants move to disqualify the law firm representing plaintiff on the ground that one of its attorneys previously represented one of the defendants in other, related matters. For the reasons stated below the motion must be denied.

## I. SUMMARY

The present action is brought by Silver Chrysler Plymouth (Dealer), an authorized dealer of Chrysler Corporation against Chrysler Motors Corporation (Chrysler) and Chrysler Realty Corporation (Realty) for breach of a dealership lease. Defendants are represented by the firm of Kelley, Drye, Warren, Clark, Carr & Ellis. Plaintiff is represented by the firm of Hammond & Schreiber.

An alleged conflict arises out of Schreiber's previous employment as an associate with Kelley, Drye, Newhall, Maginnes & Warren, predecessor to defendants' law firm (both hereinafter "Kelley Drye"), which has represented Chrysler and its affiliates in a substantial number of legal matters. Defendants claim that Schreiber's work at Kelley Drye disqualifies his firm from representing plaintiff because of confidences he may have had access to or because of the appearance of impropriety.

Issues of disqualification of counsel for conflicts based on former representation present the courts with especially delicate policy and factual decisions. On the one hand the court must protect the confidentiality of the relationship between client and attorney. This duty is laid down in Canon 4 of the Code of Professional Responsibility: "A lawyer should preserve the confidences and secrets of a client." The court is charged with the duty of insuring maintenance of "the highest ethical standards of professional responsibility." *Emle Industries, Inc. v. Patentex, Inc.*, 478 F. 2d 562, 565 (2d Cir. 1973). *See* Paterson and Cheatham, The Profession of Law 277–279 (1971).

Yet, on the other hand, the courts must be cautious not to interfere needlessly with the freedom of litigants to proceed with counsel of their choice, and, as illustrated in the circumstances of the present case, not to unnecessarily circumscribe the career of a young professional. The Canons may not be used to engross legal talent or to obtain the advantages of an implied restrictive covenant that would be of doubtful validity in any other employment situation.

## II. FACTS

A. *Counsel for the Parties*

Dale Schreiber graduated as an honor student from Columbia Law School in

June 1965. He was hired by Kelley Drye as an associate, commencing September 1965 at an annual salary of $7,800. In late fall 1965, he left Kelley Drye when he was appointed law clerk to Marvin E. Frankel, United States District Judge for the Southern District of New York. Schreiber returned to Kelley Drye in September 1966, at an annual salary of less than $10,000. In February 1969, after approximately thirty-two months total employment, he left the firm and established his own practice in White Plains, New York. In August 1970 he accepted an invitation from Mr. Hammond—a senior lawyer with a national reputation for his representation of automobile dealers—to form their present two man firm.

While relatively modest in size as compared to some other firms which range up to Baker and McKenzie's 240 lawyers, the eighty member—30 partners and 50 associates—Kelley Drye firm is well known and respected in the legal and commercial worlds. Since 1925 it has actively represented Chrysler and its associated companies, one of the nation's half dozen biggest corporate groups. Although Kelley Drye is listed on Chrysler's reports as "counsel" and its 1971 fees from Chrysler were reported to be close to $600,000, other lawyers throughout the country also represent this client. It has been estimated in affidavits before the court that the number of lawyers associated with firms representing Chrysler interests in recent years runs into the thousands. As in the case of most large law firms, Kelley Drye has a high rate of associate turnover; it is said that since 1965 this firm has probably employed some two hundred lawyers.

### B. *Present Litigation*

The complaint in the present action charges that Chrysler entered into a standard form Dealer Relocation Agreement with Dealer in January 1967. The agreement provided that Chrysler would erect a facility to be occupied by Dealer at a rental computed under a special formula. Before the new building was completed, Chrysler transferred its real estate operations to Realty. In 1968, Dealer occupied the premises, at which time it signed a new form lease agreement with Realty. The new agreement was for a five year term, compared to what Dealer alleges was the original twenty-five year period.

Dealer alleges that it was assured on signing that the new lease in no way prejudiced any rights under the original agreement. When the five year term expired in May 1973, Realty threatened Dealer with eviction unless it signed a new agreement at a higher rental. Refusing to sign, since June 1 Dealer has paid the higher rent under protest. In this action declaratory, injunctive and monetary relief to redress the alleged breach of the original Dealer Relocation Agreement is sought.

Three theories underlie the complaint. The first two, grounded on diversity and pendent jurisdiction, are essentially based on contractual breach of the Dealer Relocation Agreement by Chrysler and Realty. The third, based on the Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq., alleges that defendants coerced plaintiff into relinquishing the benefits of its Dealer Relocation Agreement by threats of termination, non-renewal and otherwise.

### C. *Prior Litigation*

As to confidences gained by Schreiber through his personal involvement in Chrysler cases, defendants allege:

> Mr. Schreiber . . . was personally engaged in extensive legal work for and representation of Chrysler . . . and other Chrysler companies, and obtained immeasurable confidential information regarding the practices, procedures, methods of operation, activities, contemplated conduct, legal problems, and litigations of those companies. . . .

More specifically, defendants charge:

> Mr. Schreiber's representation of Chrysler encompassed numerous mat-

ters in which Chrysler's real estate and other business practices were involved, as well as relationships with dealers and specific actions against Chrysler by dealers, including an action which, like the case at bar, relied in part upon an alleged violation of the Dealer's Day in Court Act.

. . .

■ While both sides have provided the court with extensive recitals of the work done by him at Kelley Drye, assessment of Schreiber's involvement in Chrsyler matters has been hampered by the absence of Kelley Drye's relevant time records. Production of such records would normally not entail disclosure of client confidences. United States v. Long, 328 F.Supp. 233 (E.D. Mo.1971). Negative inferences from the firm's failure to produce records in its exclusive control may be drawn. Cf. Case v. New York Central R. Co., 329 F.2d 936 (2d Cir. 1964); Matarese v. Moore-McCormack Lines, 158 F.2d 631, 637 (2d Cir. 1946); Pacific-Atlantic S. S. Co. v. United States, 175 F.2d 632, 636 (4th Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949).

Considerable weight must be given to the affidavit of Mr. Clark J. Gurney who was the associate most closely involved with Chrysler's dealer suits during Schreiber's tenure at the firm. Gurney affirms that to the best of his recollection Schreiber "did not work directly or indirectly on Chrysler dealer litigation, with the possible exception of researching a few specific points of law that may have been involved in a dealer case." The scope of the research is demonstrated by Schreiber's involvement in Rocco Motors v. Chrysler, Index No. 5120/1967 (N.Y.Sup.Ct.West.Co.). In Rocco, the only dealer case Schreiber recalls working on, his involvement amounted to researching a motion made to dismiss under the statute of limitations.

With respect to Chrysler realty matters both the issues raised and Schreiber's involvement appear equally remote as respects this litigation. For example, defendants argue that Schreiber represented Chrysler real estate interests in a litigation entitled Polk v. Cross & Brown Co., a suit in the Civil Court of New York City. Defendants urge, "He thereby became familiar with some of Chrysler's practices as a landlord." The details, however, belie any possible relation of the issues in Polk to the matters involved in the present action—beyond the semantic similarity that real estate was involved in both actions. Polk was an action brought by the Legal Aid Society seeking damages for a plaintiff (apparently a welfare client) who claimed he had been wrongfully evicted from the Circle Hotel. The hotel was then owned by a Chrysler subsidiary, Chrysler Manhattan. Schreiber declares that his only recollection of involvement with the case "is that I was sent down to adjourn a motion or hearing on this case." Defendants state that Schreiber drafted the answer in this action. Whatever the extent of Schreiber's involvement, the remoteness of the facts and issues of Polk to matters raised by the present action is striking.

The only significant Chrysler case in which Schreiber had extensive involvement while at Kelley Drye was Checker v. Chrysler, 283 F.Supp. 876 (S.D.N.Y. 1968), affirmed, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). In this treble damages antitrust action commenced in 1964, Checker, a manufacturer of taxicabs competing with Chrysler, alleged that Chrysler was conducting a predatory campaign to put Checker out of business in violation of the Sherman Act. Schreiber's participation involved successful opposition to motions for summary judgment and a preliminary injunction.

Checker claimed that Chrysler gave cash rebates to all purchasers of taxicabs from Chrysler dealers as part of an illegal price fixing agreement. In denying Checker's motion, the District Court found that the plan did not have a tendency to restrict the pricing independence

of dealers who remained free to determine ultimate retail sales price. At most, this case would have permitted exploration of the pricing arrangements between manufacturer and dealer. There is no substantial relation which can be reasonably established between the issues involved in the *Checker* case and the matters embraced by the current action.

### III. LAW

█ The law in this field has recently been reexamined by the Second Circuit in Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (1973). Governing standards laid down twenty years ago assure the right of a former client to protect his confidences by preventing the appearance of his attorney as an adversary in substantially related matters. As the court noted (478 F.2d at 570) (footnote omitted):

> We take as our guidepost in applying the language of Canon 4 to this case the standard articulated by Judge Weinfeld in T. C. Theatre Corp. v. Warner Bros. Pictures, 113 F.Supp. 265 (S.D.N.Y.1953). There the court said:
>
>> I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client. The court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

113 F.Supp. at 268–269 (emphasis supplied [by Court of Appeals]).

The instant case is substantially different from *Emle* and like cases, for the lawyer now sought to be disqualified was not the moving force in the earlier litigation, but rather was a young associate in a large firm, for the most part assigned to research narrow issues in the representation of Chrysler and its affiliates. *Cf.* Consolidated Theatres v. Warner Bros. Cir. Man. Corp., 216 F.2d 920, 926 (2d Cir. 1954) (salaried clerks not immune from these ethical considerations, but relationship between the matters litigated was "substantially similar" with respect to several issues); Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L.J. 917, 928 (1955) (cautioning against a rigid application of the rule of the *Consolidated Theatres* case to young professionals). There is a substantial question whether the *Emle* standard should be applied to an attorney in Schreiber's position who can only technically be said to have represented Chrysler in these earlier matters. *See also* Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm Conflicts of Interest, 73 Yale L.J. 1058, 1072 (1964) (firms aware of the lesser nature of involvement with respect to disqualification when an associate is involved).

Assessing the likelihood that Schreiber was exposed to confidential information of value to plaintiff in the present case is difficult. Undoubtedly, somewhere within the confines of Kelley Drye during the years Schreiber was employed, there existed a great deal of data, obtained confidentially, which could be of some value to some possible future antagonist of Chrysler—including plaintiff in this action. Such confidences would be in the form both of documents and of oral information acquired by other members of the firm who had represented Chrysler in various matters.

█ Decision turns on whether, in the course of the former "representation," the associate acquired information reasonably related to the particular subject matter of the subsequent represen-

tation. In making this determination the court will assume that a senior partner knows more about what is happening in the firm generally than does a junior associate. Even if this is not true as a matter of fact, the greater responsibilities, freedom of choice in selecting clients, and remuneration of the senior make it fitting that he bear the greater risk of ultimate preclusion from representing a client hostile to one his firm represented. The persuasiveness and detail of the proof required will thus vary inversely with the status of the lawyer in the firm in the prior litigation. *Cf.* Consolidated Theatres v. Warner Bros. Cir. Man. Corp., 216 F.2d 920, 927 (2d Cir. 1954) ("real capacity that of associate counsel").

 The law must reject defendants' suggestion that for purposes of disqualification, in an organization as large as Kelley Drye, every associate is charged with the knowledge of the confidences of every lawyer in the firm. Nor can it accept the more limited submission that any associate who did substantial work for a client is thereafter precluded from opposing it in any litigation. Each case must rest on a close analysis of the facts in the light of the sometimes conflicting policies favoring protection of former client confidences and freedom of new clients to retain attorneys of their choice. We analyze the facts in the light of the three categories relied upon by defendants, viz:

(1) imputation of knowledge of other attorneys at Kelley Drye;

(2) personal exposure based on Schreiber's own work on Chrysler matters; and

(3) appearance of impropriety.

1. *Imputation of Knowledge*

Defendants maintain:

As an associate here [Schreiber] was exposed without restriction, not only to matters on which he worked, but also to the entire scope of this firm's work.

Information obtained concerning the hundreds of other Chrysler matters being handled by other attorneys in this office . . . would . . . undoubtedly be of use to him in this action. . . . [T]here is an irrebuttable presumption Mr. Schreiber shared information with other attorneys.

 In the factual situation presented by the instant case the contention that there is an irrebuttable presumption of imputed knowledge must be rejected. *See* Fleischer v. A.A.P., Inc., 163 F.Supp. 548, 552 (S.D.N.Y.1958), appeal dismissed, 264 F.2d 515 (2d Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959). Only where an attorney himself represented a client in matters substantially related to those embraced by a subsequent case he wishes to bring against the former client, is he irrebuttably presumed to have benefitted from confidential information relevant to the current case. *See* Fleischer v. A.A.P., Inc., *supra*, 163 F. Supp. at 552. In such limited situations there is no necessity to demonstrate actual exposure to specific confidences which would benefit the present client. But, as Judge Herlands noted in *Fleischer (ibid.)*, in a case "where the attorney may be 'vicariously disqualified' (as by virtue of his former membership in a law partnership), the inference is treated as rebuttable."

In support of their position defendants place primary reliance upon Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, Inc., 224 F.2d 824 (2d Cir. 1955), where in a very different factual context an irrebuttable presumption of imputed knowledge was applied to bar an attorney's involvement in an antitrust case in which his former firm had been disqualified from representation. Laskey's primary significance was in its ruling that once any member of a firm is disqualified the prohibition is extended to other members of that firm. *Id.* at 826. Judge Kaufman was subsequently to note that *Laskey* made equal-

ly clear that "a former partner barred only by imputed knowledge may rebut the inference that he received confidential information from the attorney with actual knowledge." United States v. Standard Oil Company, 136 F.Supp. 345, 364 (S.D.N.Y.1955).

█ While there is some doubt whether a presumption should be applied against a challenged junior associate, we need not reach this question. Assuming, without deciding, that there is a presumption, whether it is of a classic Thayerian type, shifting only the burden of coming forward, or of the more stringent type embodied in the not yet operative Rule 301 of the Rules of Evidence for United States Courts and Magistrates, shifting both the burdens of coming forward and of persuasion, it has been rebutted by Schreiber.

Defendants' proposed rule of an irrebuttable broad presumption would forever bar any participation in any suits against any interest ever represented by a previous firm by all partners and associates of a large firm—even students working for one summer. The size and influence of modern law firms and the number of huge national and international corporate interests they represent militate against such a harsh result.

Especially is this true in relation to young associates. Their exposure to matters they are not themselves researching is necessarily limited, both by the briefness of their tenure and by their narrow responsibility with respect to the questions they are asked to investigate. Responsibility to protect client's confidences as well as the need to avoid uneconomic duplication of effort will normally restrict internal circulation of information about clients to those with some need to know. These policies tend to limit the exposure of junior associates to client confidences.

Since the largest firms represent the largest corporations with interests in all sectors of the economy, it is almost impossible to have an important client or its subsidiary avoid some kind of legal relationship with another client at some time. Cf. E. O. Smigel, The Wall Street Lawyer 234 (1964). "Where a firm represents concurrently conflicting interests, the practice is sometimes followed of 'splitting up' the firm into separate teams of lawyers, each of which represents one of the antagonistic clients." Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm Conflicts of Interest, 73 Yale L.J. 1058, 1071 (1964). Cf. J. C. Goulden, The Superlawyers 53 (1972) (Covington and Burling "isn't really a law firm. . . . Actually, it's a conglomeration of fifty law practices."). The fact that attorneys within the firm are effectively insulated from exposure to the confidences of other clients where necessary demonstrates the inappropriateness of an invariable mechanical imputation of knowledge. Here the evidence demonstrates that there was no actual knowledge.

### 2. Actual Knowledge

The remoteness of Schreiber's role in previous Chrysler litigation is particularly apparent when compared with the activities of attorneys involved in the cases where disqualification has been required. In Motor Mart, Inc. v. Saab Motors, Inc., 359 F.Supp. 156 (S.D.N.Y. 1973), the case which defendants urge has striking similarity to the current action, disqualified counsel had sought to bring an action for damages against Saab under the Dealer's Day in Court Act based on claims of unlawful termination of an automobile dealership. Counsel had represented Saab on a regular basis over a five year period. He had drafted the basic dealer agreement used by Saab, in addition to being involved extensively in other aspects of the company's legal relations to its dealers. During that period, he represented Saab in a state court case based on substantially similar allegations. His apparent role in representing the client in a broad range of activities, some of them relating directly to matters embraced by the litigation in which he was

disqualified, cannot be meaningfully compared to Schreiber's work at Kelley Drye.

### 3. *Appearances of Impropriety*

■ Defendants seem to suggest that the complexities of the factual determination to be made by this court should be avoided by a decision couched in notions of possible appearance of impropriety. On the contrary, the importance of the underlying policy considerations call for careful analysis of the matters embraced by previous and present litigations. Vague or indefinite allegations do not suffice. Actual activities on specific cases by Schreiber must be demonstrated which would make it reasonable to infer that he gained some information about his former client of some value to his present client. The danger of damage to public confidence in the legal profession would be great if we were to allow unfounded charges of impropriety to form the sole basis for an unjust disqualification.

### IV. DANGERS OF UNNECESSARY RESTRICTIONS ON YOUNG ATTORNEYS

A concern both for the future of young professionals and for the freedom of choice of the litigant in specialized areas of law requires care not to disqualify needlessly. As Judge Clark wisely cautioned in Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures, Inc., 224 F.2d 824, 827 (2d Cir. 1955), the rules of disqualification should not be so rigid that "young lawyers might seriously jeopardize their careers by temporary affiliation with large firms."

■ Changing times have resulted in continual modification of the practitioner's ethical, social and political roles in our society. *See* Patterson and Cheatham, The Profession of Law 19–23, 65–67 (1973). Rules appropriate in guiding lawyers of several decades ago must be applied in light of current realities. *See* Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm Conflicts of Interest, 73 Yale L.J. 1058 (1964). As the author of the Yale Note perceptively points out (at 1069), the rigid rule of total disqualification

> is premised in the day when firms, when they existed, were very small— also a day when attorneys most frequently could think of their activities in terms of discrete "matters". Increasingly, neither condition maintains.

Law remains one of the few professions where young people can establish themselves without large amounts of initial capital. Many distinguished lawyers have served brief apprenticeships with large firms where they have, in many instances, concentrated their work in highly specialized fields. The mode of assignment of work to young associates in modern large law firms make unreasonable a rule of disqualification which would prevent them from ever litigating against clients of their former firm. Young lawyers will necessarily become overcommitted to their initial employer if the rules of disqualification are applied so as to prevent them from being retained by clients seeking their specialized services.

The dangers are enhanced by an increasing trend towards concentration in the legal profession. There has been a dramatic decrease over the past two decades in the percentage of lawyers practicing individually and a corresponding increase in the percentage of attorneys affiliated with firms. American Bar Foundation, The 1971 Lawyer Statistical Report (1972). In 1951 59% of the attorneys in this nation were individual practitioners, while 27.8% were partners or associates in firms; by 1970 the percentage of attorneys practicing alone had shrunk to 36.6%, while 36.1% were now associated with firms. *Ibid.* at p. 10.

Large law firms throughout the country continue to grow in size and relative power. *See, e. g.,* E. O. Smigel, The Wall Street Lawyer 43 (1964). They also continue to attract a more than proportionate share of exceptional

law school graduates. A dramatic example is provided in Kohn v. Royall, Koegel & Wells, 59 F.R.D. 515, 520–521 (S.D. N.Y.1973), a challenge to the hiring practices of one of this city's large firms. The case reveals that of approximately 500 women in the legal profession in a position to receive consideration for jobs at Royall, Koegel & Wells in 1970, the firm received applications from 78 women—some 16%. While there has reputedly been a slight decrease in the popularity of the large law firms among the most dedicated young lawyers, they still offer the highest potential income and tend to attract the largest share of talented law graduates. *See, e. g.,* P. Hoffman, Lions in the Street 4, 132–134 (1973); J. C. Goulden, The Superlawyers 55, 59 (1972); M. Mayer, The Lawyers 111 (1967); E. O. Smigel, The Wall Street Lawyer 38–39 (1964); Note, A Survey of Chicago Law Student Opinions and Career Expectations, 67 Nw.U.L.Rev. 628, 629, 639–40 (1973). With large firms exerting such a compelling influence over bright young lawyers, rules which would seriously curtail their future work must be construed so that they are not applied in an unnecessarily restrictive way.

The problem is not limited to associates in large firms. It exists in smaller communities where a few law firms handle most of the commercial practice or in national firms of a modest size specializing in areas of law or commerce. M. Mayer, The Lawyers 388 (1967). As one astute commentator put it (Note, Unchanging Rules in Changing Times: The Canons of Ethics and Intra-firm Conflicts of Interest, 73 Yale L.J. 1059, 1068 (1964) (footnotes omitted)):

> Such unexpected conflicts, either between current clients or between a current and past client, are particularly to be expected in the smaller metropolitan centers, where a small number of law firms handle much of the area's substantial commercial practice. The

problem frequently appears in the larger cities as well, however, where the firm represents a full roster of major commercial clients whose very size and range of operation make it inevitable that they come in conflict on a more or less regular basis. The incidence of sudden conflicts between current or past clients may also be aggravated by the growing specialization among some law firms. As a firm's business is conducted within increasingly narrow scope, the class of potential clients is usually reduced correspondingly.

*See also* Proceedings of American Law Institute, 41 U.S.L.W. 2627 (1973) (P. A. Wolkin forecasting an accelerated tendency towards specialization in the bar); I. F. Reichert, Jr., The Future of Continuing Legal Education, 178, in Law in A Changing America (G. C. Hazard, Jr., ed. 1968).

In a related field, that of restrictions on the right of employees to compete with their former employers, the courts have refused to enforce covenants overly restrictive of free trade. *See, e. g.,* Blake, Employment Agreements Not to Compete, 73 Harv.L.Rev. 625 (1960); Goldschmidt, Antitrust's Neglected Stepchild: A Proposal For Dealing With Restrictive Covenants Under Federal Law, 73 Col.L.Rev. 1193 (1973). In applying a test of reasonableness to such restraints, Professor Blake points out, hardship on the employee as well as the injury to society are crucial factors in the court's determination as to whether the covenant will be allowed. *Cf.* Goldschmidt, 73 Col.L.Rev. 1193, 1196. As early as 1831 the English courts recognized that such restrictions would be held invalid where found "so large as to interfere with interests of the public." Homer v. Graves, 7 Bing. 735, 743, 131 Eng.Rep. 284, 287 (C.P.); Blake, 73 Harv.L.Rev. 625, 639. Professor Blake's analysis of the possible damages to society of employment restrictions serves as an apt description of some of the hazards incident to an unnecessarily harsh

rule of attorney disqualification. Such restrictions

reduce both the economic mobility of employees and their personal freedom to follow their own interests. These restraints also diminish competition by intimidating potential competitors and by slowing down the dissemination of ideas, processes and methods. *Id.*, at 627.

Antitrust implications in unduly restricting the work of the largest law firms' former associates are not insubstantial since these firms have as clients corporations that control a major share of the American economy. *See, e. g.*, P. Hoffman, Lions in the Street 16–36, 40–41, 43–44 (1973); W. J. Hudson, Outside Counsel: Inside Directors-Lawyers on the Boards of American Industry (1973). Large law firms may not protect their clients by monopolizing young talent. The Canons of Ethics furnish no warrant for illegal restraints on trade.

We agree, as the Court of Appeals put it, that the courts should be cautious lest they "cast aside ethical responsibilities out of an excess of antimonopolistic fervor." Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 574 (2d Cir. 1973). But neither should the courts ignore the practical effect of, to paraphrase *Emle*, "an excess of ethical fervor," that unnecessarily restricts freedom of attorneys, clients, and our system of free enterprise. In his dissent in Harmar Drive-In-Theatre, Inc. v. Warner Bros. Pictures, Inc., 239 F.2d 555, 559 (2d Cir. 1956), reh. denied, 241 F.2d 937, cert. denied, 355 U.S. 824, 78 S.Ct. 31, 2 L. Ed.2d 38 (1957), Judge Clark cautioned:

. . . the dangers of using legal ethics as a club to protect monopolists or harass complainers . . . suggest care and concern lest we go too far.

Disqualification of plaintiff's counsel is not warranted. Defendants' motion is denied.

So ordered.